CASE NUMBER 14-2159

IN THE
UNITED STATE COURT OF APPEALS
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA, PLAINTIFF-APPELLEE

-vs-

ALVIN RAY, DEFENDANT-APPELLANT

ON APPEAL FOR THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF MICHIGAN AT DETROIT
HON. AVERN COHN, Case No. 13-cr-20143-1

***CORRECTED*** **BRIEF OF DEFENDANT-APPELLANT
ALVIN RAY**

MARK H. MAGIDSON (P25581)
ATTORNEY AT LAW
615 GRISWOLD, SUITE 810
DETROIT, MI 48226
(313) 963-4311

Date: January 8, 2015

ATTORNEY FOR DEFENDANT-
APPELLANT, ALVIN RAY

**ORAL ARGUMENT REQUESTED**

# **TABLE OF CONTENTS**

**PAGE**

TABLE OF CONTENTS……………………………………….…...........….i

TABLE OF AUTHORITIES……………………………………….............iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT……………...............……v

STATEMENT OF SUBJECT MATTER AND APPELLATE
JURISDICTION………………………………………………..…...........1

STATEMENT OF ISSUES PRESENTED…………………………..…...........…2

STATEMENT OF THE CASE……………………………………...............……4

SUMMARY OF ARGUMENT……………………………….................12

ARGUMENT………………........................................……….……….…..15

I.    THE TRIAL COURT ABUSED ITS DISCRETION, VIOLATING
     DEFENDANT'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL
     UNDER THE FIFTH AMENDMENT TO THE US CONSTITUTION,
     BY REFERING TO THE TITLE OF COUNT 1 AS "FELON IN
     POSSESSION OF A FIREARM" AND BY ADMITTING
     DEFENDANT'S PRIOR RECORD…………………………...…………..15

II.   THE DEFENDANT'S RIGHT TO DUE PROCESS UNDER THE FIFTH
     AND FOURTEENTH AMENDMENTS TO THE US CONSTITUTION
     WAS VIOLATED BY HIS CONVICTION FOR POSSESSION OF A
     FIREARM IN FURTHERANCE OF A DRUG TRAFFICKING
     CRIME UPON INSUFFICIENT EVIDENCE AS A MATTER OF
     LAW…………………………………………………………………….28

III.  THE TRIAL COURT VIOLATED DEFENDANT'S RIGHT AGAINST
     SELF-INCRIMINATION UNDER THE FIFTH AMENDMENT TO THE
     US CONSTITUTION BY ADMITTING HIS INOLUNTARY
     STATEMENTS…………………………………………….…………34

IV.     THE TRIAL COURT ABUSED ITS DISCRETION AND VIOLATED
        DEFENDANT'S RIGHTS TO BE FREE FROM UNREASONABLE
        SEARCHES, DUE PROCESS, A FAIR TRIAL, AND PREPARE HIS
        DEFENSE UNDER THE FOURTH, FIFITH, SIXTH, AND
        FOURTEENTH AMENDMENTS TO THE US CONSTITUTION BY
        DENYING DISCOVERY OF INFORMATION RELATED TO THE
        POLICE INFORMANT…………………………………………….……39

V.      THE TRIAL COURT CLEARLY ERRED AND VIOLATED
        DEFENDANT'S FOURTH AMENDMENT RIGHT TO BE FREE
        FROM UNREASONABLE SEARCHES BY ADMITTING
        EVIDENCE SEIZED UNDER AN UNLAWFUL WARRANT……..…..42

VI.     THE TRIAL COURT COMMITEED REVERSABLE ERROR
        ENTITLING DEFENDANT TO A NEW TRIAL WHEN IT
        DEVIATED FROM REREADING THE STANDARD JURY
        INSTRUCTION WHEN THE JURY SOUGHT CLARIFICATION
        OF "ADVANCE AND PROMOTE" AS IT RELATED TO THE
        POSESSION OF THE WEAPON(S)………………………………..…46

CONCLUSION…………………………………………….……..………........49

CERTIFICATE OF COMPLIANCE…………………………………..............…50

CERTIFICATE OF SERVICE……………………………………….……........50

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS............51

ADDENDUM A………………The Sentencing Project article, September 2004.

ADDENDUM B…………….....The Sentencing Project, "Felony
                            Disenfranchisement Laws in the United States,"
                            April 2014.

ADDENDUM C………………*U.S. v. Parrish*, 127 F.3d 1103, 3 (1997)
                            (unpublished opinion).

ADDENDUM D………………*U.S. v. Campbell*, 2009 WL 595980
                            (E.D. Tenn.)(unpublished opinion).

## <u>TABLE OF AUTHORITIES</u>

**CASE LAW**                                                           **PAGE**

*Bailey v. United States*, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472
(1995)……………………………………………………………………….30-31

*Bryan v. United States* (1950), 338 U.S. 552, 70 S.Ct. 317, 94 L.Ed. 335,
rehearing denied (1950), 338 U.S. 957……………………………………..…..29

*Fare v. Michael C.,* 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)……..…35

*Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)…..43-44

*Gordon v. United States*, 383 F.2d 936 (D.C. Cir. 1967), cert. denied,
390 U.S. 1029 (1968)……………………………………………………..……26

*In Re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)……..…29

*Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)……....28

*Lego v. Twomey*, 404 U.S. 477 (1972)……………………………….….…..……..45

*Michelson v. United States,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168
(1948)……………………………………………………………………….……17

*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)..….35-36

*Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004)…35-36

*Old Chief v. U.S.,* 519 U.S. 172, 117 S.Ct. 644 (1997)……………….....…16, 22-24

*Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297
(1980)…………………………………………………………………………..36

*Roviaro v. U.S.*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957)……………39-40

*Stewart v. Donges*, 915 F.2d 572, 582 (10th Cir. 1990)…………………………..44

*United States v. Blakeney*, 942 F.2d 1001, 1010 (6th Cir. 1991)……….…….…..28

*United States v. Beals*, 698 F.3d 248, 269 (6th Cir. 2012)………………….……40

*United States v. Beauchamp*, 659 F.3d 560, 565 (6th Cir. 2011)……………….…42

*United States v. Campbell*, 2009 WL 595980, 2 (E.D. Tenn.)(unpublished opinion)(Exhibit D)………………………………………………….……27

*United States v. Clark*, 988 F.2d 1459, 1468 (6th Cir. 1993)………....………..46

*United States v. Dotson,* 49 F.3d 227, 229 (6th Cir. 1995)……………....……..34

*United States v. Ellzey*, 874 F.2d 324, 328 (6th Cir. 1989)……………….…….28

*United States. v. Fisher*, 648 F.3d 442, 446-447 (6th Cir. 2011)……….….……46

*United States v. Iiland,* 254 F.3d 1264, 1274 (10th Cir. 2001)…………….……..30

*United States v. Jenkins*, 4 F.3d 1338, 1341 (6th Cir. 1993)………………….……39

*United States v. Kennedy*, 131 F.3d 1371, 1376 (6th Cir. 1997)………..…..….…44

*United States v. Leake,* 998 F.2d 1359, 1362 (6th Cir. 1993)……………….……34

*United States v. Mackey*, 265 F.3d 457, 460-463 (6th Cir. 2001)……….…..……30-32

*United States v. Martin*, 526 F.3d 926, 936 (6th Cir. 2008)……………….…….42

*United States v. Meyers*, 952 F.2d 914, 916–17 (6th Cir. 1992)…………….…...26

*United States v. Moccia,* 681 F.2d 61, 63 (1st Cir. 1982)………………….....…..17

*United States v. Moore*, 917 F.2d 215, 233 (6th Cir. 1990)…………….…...…….15

*United States v. Parrish*, 127 F.3d 1103, 3 (1997)(unpublished opinion) (Exhibit C)……………………………………………………………...24, 26

*United States v. Young*, 553 F.3d 1035, 1050 (6th Cir. 2009)…………….…….46

**UNITED STATES CODE**                         **PAGE**

18 U.S.C. 3231……………………………………………………1

18 USC 922……………………………………………….….4, 13, 21, 24, 27

18 USC 924……………………………………………….….4, 29

21 USC 841………………………………………………….…4

28 U.S.C. 1291……………………………………………….…1

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Defendant-Appellant, Alvin Ray, requests Oral Argument. Many intricate facts regarding the government's investigation of this case, pretrial motions to suppress, and the testimony of several witnesses were prominent issues at the district court. Oral argument would significantly aid this Court's decision.

## STATEMENT OF SUBJECT MATTER JURISDICTION AND APPELLATE JURISDICTION

1. Subject matter jurisdiction is this case was vested in the United States District Court for the Eastern District of Michigan upon the unsealing of the Indictment (RE 7) on February 21, 2013, naming the United States of America as Plaintiff and Alvin Ray as Defendant by virtue of 18 U.S.C. § 3231, which grants original jurisdiction to the District Court over all offenses against the laws of the United States.

2. Appellate jurisdiction in this case was vested in this Court upon the filing of the Notice of Appeal (RE 83) by Defendant-Appellant on September 5, 2014, from the Sentencing (RE 81) of September 2, 2014, followed by the final order and Judgment and Commitment (RE 82) that was entered on September 4, 2014, by virtue of 28 U.S.C. §1291, which grants the Circuit Court of Appeals jurisdiction to review all final decisions in the District Courts.

3. This appeal is from a Judgment disposing of all potential claims with respect to all the parties.

## STATEMENT OF ISSUES

I.  DID THE TRIAL COURT ABUSE ITS DISCRETION, VIOLATING DEFENDANT'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL UNDER THE FIFTH AMENDMENT TO THE US CONSTITUTION, BY REFERING TO THE TITLE OF COUNT 1 AS "FELON IN POSSESSION OF A FIREARM" AND BY ADMITTING DEFENDANT'S PRIOR RECORD?

The Defense says: Yes.
The Government says: No.
The Trial Court said: No.

II.  WAS THE DEFENDANT'S RIGHT TO DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE US CONSTITUTION VIOLATED BY HIS CONVICTION FOR POSSESSION OF A FIREARM IN FURTHERANCE OF A DRUG TRAFFICKING CRIME UPON INSUFFICIENT EVIDENCE AS A MATTER OF LAW?

The Defense says: Yes.
The Government says: No.
The Trial Court said: No.

III.  DID THE TRIAL COURT VIOLATE DEFENDANT'S RIGHT AGAINST SELF-INCRIMINATION UNDER THE FIFTH AMENDMENT TO THE US CONSTITUTION BY ADMITTING HIS INOLUNTARY STATEMENTS?

The Defense says: Yes.
The Government says: No.
The Trial Court said: No.

IV.    DID THE TRIAL COURT ABUSE ITS DISCRETION AND VIOLATE DEFENDANT'S RIGHTS TO BE FREE FROM UNREASONABLE SEARCHES, DUE PROCESS, A FAIR TRIAL, AND PREPARE HIS DEFENSE UNDER THE FOURTH, FIFITH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE US CONSTITUTION BY DENYING DISCOVERY OF INFORMATION RELATED TO THE POLICE INFORMANT?

The Defense says: Yes.
The Government says: No.
The Trial Court said: No.

V.    DID THE TRIAL COURT CLEARLY ERR AND VIOLATE DEFENDANT'S FOURTH AMENDMENT RIGHT TO BE FREE FROM UNREASONABLE SEARCHES BY ADMITTING EVIDENCE SEIZED UNDER AN UNLAWFUL WARRANT?

The Defense says: Yes.
The Government says: No.
The Trial Court said: No.

VI.    DID THE TRIAL COURT COMMIT REVERSABLE ERROR ENTITLING DEFENDANT TO A NEW TRIAL WHEN IT DEVIATED FROM REREADING THE STANDARD JURY INSTRUCTION AFTER THE JURY SOUGHT CLARIFICATION OF "ADVNACE AND PROMOTE" AS IT RELATED TO THE POSESSION OF THE WEAPON(S)?

The Defense says: Yes.
The Government says: No.
The Trial Court said: No.

## STATEMENT OF THE CASE

This is a direct appeal by Defendant-Appellant, Alvin Ray, from a criminal Judgment and commitment (Judgment, RE 82, Page ID 446) entered on September 4, 2014 by the United States District Court for the Eastern District of Michigan, Southern Division at Detroit, Michigan.

On February 21, 2013, the Federal Grand Jury returned an Indictment (Ind., RE 7, Page ID 11-13) charging Ray with violating four counts.

Specifically, Ray was charged with (1) being a Felon in Possession of a Firearm, 18 USC 922 (g)(1), 18 USC 924(a)(2); (2) Possession with Intent to Distribute Controlled Substance-Cocaine, 21 USC 841(a)(1), 21 USC 841(b)(1)(C); (3) Possession with Intent to Distribute Controlled Substance-Marijuana, 21 USC 841 (a)(1), 21 USC 841(b)(1)(D); and, (4) Possession of a Firearm in Furtherance of a Drug Trafficking Crime, 18 USC 924(c), 18 USC 924(c)(1)(A)(i). (Ind., RE 7, Page ID 11-12).

After his arrest and detention without bond, the Defense filed a motion for a *Franks*[1] hearing challenging the truthfulness of the statements supporting the warrant that authorized a search of his home. (*Franks* Mtn., RE 23, Page ID 36-44). The hearing took place on July 29, 2013.

---

[1] *Franks v. Delaware*, 438 U.S. 154, 171 (1978).

At that hearing, Detroit Police Officer Aaron Yopp testified for the Government. (*Franks* Tr., RE 38, Page ID 106). Yopp testified that he received narcotics complaints about drug dealing at the address of 9241 Genessee, Detroit, MI; however, Yopp could not remember any specific complaints that he allegedly received and none were recorded. *Id*. at 113, 123-125. According to Ray's attorney, the defense investigator could not uncover any "complaints" regarding the subject home. *Id*. at101-102.

On August 22, 2012, Yopp decided to use a Source of Information (SOI) to make a "controlled buy" at 9241 Genessee without conducting any surveillance of the residence first. *Id*. at 108-110, 112. From his parked car, Yopp watched the SOI go to the front door of 9241 Genessee but could not see who opened the front door, nor could he see the drug transaction that the SOI alleged took place. *Id*. at 120, 137. Yopp issued cash to the SOI (without recording the serial numbers) before sending him to 9241 Genessee, and the SOI returned with a knotted bag of 0.8 grams of marijuana. *Id*. at 114, 129, 142. Based on that information, Yopp obtained a search warrant that was executed the next day on August 23, 2012. (Warrant, RE 23-1, Page ID 45).

The trial court denied Ray's request to suppress the evidence discovered during the execution of the warrant: cocaine, marijuana, and firearms. (Order Deny *Frank's* Mtn., RE 31, Page ID 88). The trial court also denied Ray's later motion

for discovery of the SOI, or the Informant, his/her name, information regarding his background working for the police, and the police records and notes related to the SOI. (Discovery Mtn., RE 40, Page ID 156-165)(Order Deny Discovery, RE 45, Page ID 204-211).

At trial, the testimony established that the police executed the search warrant for 9241 Genessee on August 23, 2012. (Trial Tr. 1, RE 89, Page ID 655). The police testified that, during the raid, they discovered a shotgun behind a bedroom door, 3 shotgun shells, marijuana, 49 baggies of cocaine inside a letterman's jacket, $148, and a .380 handgun inside of another jacket pocket. *Id*. at 662-665, 671, 708.

The police also discovered Defendant Ray and the mother of his child, Cara Lee, in the upstairs bedroom where they allegedly found the shotgun and marijuana. *Id*. at 735. In a second upstairs bedroom, the police found a Marlin .22 rifle in the closet; and in the basement, they found an old, rusty, non-functioning rifle, which was not part of the charged counts at trial. *Id*. at 746, 752.

While the police were processing the evidence at 9241 Genessee, Officer Robson testified that he had a conversation with Ray and Cara Lee about the fact that Lee worked at the Wayne County Circuit Court, and that Ray thought the police were there to raid a neighbor's house when he first heard them shouting. *Id*. at 717-718.

The police released Lee at the house and arrested Ray, taking him to the police station. At the station, approximately an hour-and-a-half later, the police interviewed Ray after reading his *Miranda* warnings. (Const. Rights Form, RE 24-4, Page ID 66-68) (Trial Tr. 1, RE 89, Page ID 681). An Officer Hill hand wrote the police's questions and Ray's answers during the interview while officer Robson was present. (Const. Rights Form, RE 24-4, Page ID 66-68) (Trial Tr. 1, RE 89, Page ID 691). [Officer Hill died from unrelated causes at some time after the execution of the warrant and before trial, without testifying at any pretrial hearings. (Trial Tr. 1, RE 89, Page ID 682).]

According to the police, Ray stated that he held a birthday party the night before the raid, that he sold marijuana for two months, that he had lived at 9241 Genessee for ten years, that the shotgun belonged to him but not the other firearms—which belonged to his girlfriend's uncle—and that the cocaine in the closet was left by a friend the night before. (Ray State., RE 24-4, Page ID 67-68) (Trial Tr. 1, RE 89, Page ID 691-695).

Before the trial, the Defense filed a motion to suppress his statements made to the police because they were involuntarily made. (Mtn. Suppress State., RE 42, Page ID 172). However, the trial court denied the motion without a hearing, assuming Ray's allegations to be true. (Order Deny Mtn., RE 45, Page ID 210).

The Defense also filed a motion in limine to suppress the use of Ray's prior record and to prohibit the title "felon in possession" from being used in front of the jury, telling the jury instead that Ray was charged with "unlawfully possessing a firearm." (Mtn. Limine, RE 49, Page ID 233-234). However, the trial court refused to make an advanced ruling about the admissibility of Ray's prior record until trial and only if Ray decided to testify, and the trial court ruled that use of the title "felon in possession" rather than "unlawful possession" was not prejudicial. (Limine Hrg. Tr., RE 88, Page ID 615, 617, 621).

During the jury selection process, at 7 different times, the magistrate informed the jury venire that Ray was being charged as a "felon in possession" of a firearm; and, that information was given in relation to questions about the jurors' beliefs that a defendant with a prior record had the propensity to commit the charged offense. (Voir Dire Tr., RE 86, pp. 55, 92, 97, 106, 117-118, 124).

Ray decided to testify at trial, and because of the trial court's prior rulings, the Defense preemptively disclosed the fact that Ray had a prior felony record and that his prior felony conviction was also for a gun charge in 2005. (Trial Tr. 3, RE 91, Page ID 860, 892, 906, 928, 938).

Ray then told the jury that he had the marijuana in his house because he was providing it for the combined birthday party he threw the night before, on August 22, 2012, for his own and Cara Lee's birthdays that were only a few days apart. *Id.*

at 939-940. Ray testified that he would trade marijuana with his friends for liquor or money for social use. *Id*. The $148 dollars in cash that the police found was not drug money; it was from Ray's unemployment checks. *Id*.

Ray also testified that a young person he knew from the neighborhood, Anthony Maddox, came to the party, but Ray would not allow him to stay because he was too intoxicated. *Id*. at 941-943. When Ray discovered that Maddox possessed crack cocaine and a pistol, he told Maddox to put those items inside of the front closet in the house, and called a cab to take Maddox home. *Id*. at 944. Ray did not see what Maddox specifically did with the items in the closet. *Id*. at 944-945.

When the police raided Ray's house, they handcuffed him and Cara Lee and put them in a front room downstairs. *Id*. at 948. While he was in the front room, Ray saw the police bring a number of firearms upstairs from the basement inside of a milk crate. *Id*. at 949, 979. Ray did not recognize any of the firearms that the police seized, and denied that the shotgun and shells were in his bedroom. *Id*. at 951.

Contrary to officer Yopp and Robson's testimony, Ray testified that a lengthier conversation took place in that front room between the police, Ray, and Lee. *Id*. at 958-963. That discussion was about Lee working at Wayne County as a clerk, and that she was going to jail. *Id*. They also discussed who owned the

firearms. *Id*. Ray decided to take responsibility for possession of the shotgun to protect Lee and spare his son, who was present, from seeing his mother arrested and hauled away in handcuffs. *Id*. Ray further explained to the police that the other firearms belonged to Lee's deceased uncle. *Id*. at 963.

The police released Lee at the house, and took Ray to the police station. *Id*. at 961. Ray told the jury that the police wanted to have an "off the record" discussion before they conducted their custodial interrogation. *Id*. at 984. The police wanted to know if Ray could name a drug supplier, so Ray tried to tell them about Maddox as the source of the pistol and cocaine; however, the police were not interested in Ray's explanation. *Id*. at 987.

Cara Lee testified, corroborating Ray's account of the events at the house the night before and during the police raid. *Id*. at 864-867. Lee also testified that she did not see the shotgun in the bedroom or ever before. *Id*. at 868, 872-873. Lee stated that she told the police about working as a clerk for the county and asking whether she was going to jail. *Id*. at 871.

Lee also explained that the Genessee house actually belonged to her mother, Patsie Lee, who used to live there but had moved to a house in Redford, still in the process of moving her things that were left in the second bedroom. *Id*. at 861-862. Lee said that her uncle had passed away earlier and bequeathed a firearm to her mother, Patsie; although, Cara Lee never actually saw the firearm. *Id*. at 873.

Patsie Lee testified that she inherited firearms from her brother, among them a shotgun, and she had purchased a rifle of her own for protection. *Id*. at 892, 895, 897-898. Patsie did not take any of those firearms from Genessee to her new house in Redford. *Id*. at 897-898. It was later stipulated by the parties that the rifle found in the second bedroom closet was the rifle purchased by Patsie. (Trial Tr. 4, RE 92, Page ID 991-992). Patsie Lee imposed a rule in her house while at Genessee that no one was allowed into her bedroom or closet, and that she did not approve of anyone else bringing firearms into the house. (Trial Tr. 3, RE 91, Page ID 894-895).

The Defense called another 6 witnesses who testified about being friends and family with Ray, about being at the party the night before and never seeing Ray with cocaine and firearms in their long relationships and contact with him. (Trial Tr. 3, RE 91, Page ID 874-875, 892, 907, 909, 917, 922, 929, 935).

After closing arguments, the case went to the jury, which later sent out a question for clarification of the term "advance or promote" in the instruction for finding Ray guilty of possession of a firearm in the furtherance of drug trafficking. (Trial Tr. 4, RE 92, Page ID 1055, 1064). The trial court adopted Government's request to read a further definition about "mere possession" without hearing Defense Counsel's objection and request to simply re-read the original instruction. *Id*. at 1066-1068.

On May 23, 2014, the jury returned a unanimous verdict of guilty on all counts. *Id*. at 1072.

Ray was sentenced on September 2, 2014 to 24 months for the first three counts to be served concurrently, and 60 months for count four—possession of a firearm in furtherance of drug trafficking—to be served consecutively to the prior three counts. (Sent. Tr., RE 93, Page ID 1082)(Amended Judge., RE 85, Page ID 457).

Following the imposition of sentence and entry of Judgment (Judge., RE 82, Page ID 446-448), Ray timely appealed his conviction on September 15, 2014. (Notice of App., RE 83, Page ID 453).

## SUMMARY OF THE ARGUMENTS

Defendant-Appellant, Alvin Ray, argues that he was denied a fair trial because the trial court denied his motion to refer to Count 1 of the Information as "unlawful possession of a firearm" rather than "felon in possession." 18 USC 924(g)(1). Ray argues that the same reasoning and prejudice that prohibits a court from telling the jury the substance and nature of the prior felony if he stipulates to

having a prior record for that element of the charge, the jury likewise does not need to know that he is a "felon" in order to decide whether he possessed a firearm because jurors would naturally have the propensity to believe he is guilty because he is a "felon."

The evidence presented by the Government on the issue of whether Ray possessed a firearm "in furtherance of" a drug trafficking crime (18 USC 922(c)) was insufficient as a matter of law to support his conviction, especially when considered with Ray's rebuttal evidence. The Government's evidence relied heavily upon the opinion and experience of the arresting officers rather than direct evidence linking Ray to the firearms.

Ray moved the trial court to suppress his post-*Miranda* statements because they were made involuntarily and were tainted by his earlier pre-Miranda statements, also made involuntarily in an effort to prevent the arrest of the mother of his child.

Twice, Ray moved the trial court for discovery of information about the police Informant used to make an alleged controlled buy the day before the police executed a warrant. The warrant was supported by an affidavit alleging narcotics complaints about Ray's residence and by details from the alleged controlled buy.

Ray's discovery request was a part of his challenge to the warrant and affidavit under *Franks v. Deleware, supra*. Ray argued that the affiant lied about

the alleged narcotics complaints and that the alleged controlled buy did not occur. Ray also argued that the requested discovery information about the informant was relevant to the trial court's instruction that "the type of drug activity being conducted" is a factor relevant to the determination of whether the firearms was possessed in the furtherance of the crime. (Trial Tr. 4, RE 92, Page ID 1068). It was also relevant to whether Ray was the person who allegedly sold marijuana, whether larger amounts were mentioned, whether firearms were involved or visible, how the drugs were packaged, and whether or not this was a case of possession versus delivery.

Finally, Ray argues that the trial court clearly erred by further instructing the jury in response to a question seeking clarification of the terms "advance and promote" in relation to possessing the firearms to further drug trafficking. The further instruction confused the jury and muddled the instruction.

# ARGUMENT

**I.    THE TRIAL COURT ABUSED ITS DISCRETION, VIOLATING
DEFENDANT'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL
UNDER THE FIFTH AMENDMENT TO THE US CONSTITUTION,
BY REFERING TO THE TITLE OF COUNT 1 AS "FELON IN
POSSESSION OF A FIREARM" AND BY ADMITTING
DEFENDANT'S PRIOR RECORD.**

**Standard of Review**.

The trial court's decision to admit evidence is reviewed for an abuse of
discretion. *U.S. v. Moore*, 917 F.2d 215, 233 (6th Cir. 1990).

The Defense preserved this issue for review by filing a motion in limine and
objecting before voir dire of the jury panel. (Mtn. Limine, RE 49, Page ID 228-
234)(Limine Hrg. Tr., RE 88, Page ID 613, 621)(Voir Dire Tr., RE 86, pp. 3-4).

**A.    "Felon in Possession."**

The Defense moved the trial court to prohibit the use of the title "felon in
possession" in front of the jury; and instead, tell the jury that Ray was charged with
"unlawfully possessing a firearm." (Mtn. Limine, RE 49, Page ID 233-234).
However, the trial court ruled that use of the title "felon in possession" rather than
"unlawful possession" was not prejudicial. (Limine Hrg. Tr., RE 88, Page ID 615,
617, 621).

15

The trial court has the authority and discretion under Fed. Rule Evid. 403 to exclude relevant evidence when its "probative value is substantially outweighed by the danger of unfair prejudice. . . ." *Old Chief v. U.S.,* 519 U.S. 172, 180, 117 S.Ct. 644, 650 (1997).

The term "unfair prejudice," "speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief, supra*, (citing 1 J. Weinstein, M. Berger, & J. McLaughlin, Weinstein's Evidence ¶ 403[03] (1996). "'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Advisory Committee's Notes on Fed. R. Evid. 403, 28 U.S.C.App., p. 860.

As the US Supreme Court in *Old Chief* held, such improper grounds include the "felon" title used here: "generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged (or, worse, as calling for preventive conviction even if he should happen to be innocent momentarily)." *Old Chief, supra* 519 US at 180-181. As then Judge Breyer put it, "Although . . . 'propensity evidence' is relevant, the risk that a jury will convict for crimes other than those charged—or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment—creates a prejudicial

16

effect that outweighs ordinary relevance." *United States v. Moccia,* 681 F.2d 61, 63 (1st Cir. 1982).

Justice Jackson described how the law has handled this risk:

Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. Not that the law invests the defendant with a presumption of good character. . .but it simply closes the whole matter of character, disposition and reputation on the prosecution's case-in-chief. The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.

*Michelson v. United States,* 335 U.S. 469, 475–476, 69 S.Ct. 213, 218–219, 93 L.Ed. 168 (1948) (footnotes omitted).

Federal Rule of Evidence 404(b) reflects that common law tradition by addressing propensity reasoning directly: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b). Propensity is an "improper basis" for conviction, and evidence of a prior conviction is subject to analysis under Rule 403 for relative probative value and for prejudicial risk of misuse as propensity evidence. *Old Chief*, *supra*, 519 US at 182 (*citing* 1 J. Strong, McCormick on Evidence 780 (4th ed. 1992))(Rule 403 prejudice may occur, for example, when

17

"evidence of convictions for prior, unrelated crimes may lead a juror to think that since the defendant already has a criminal record, an erroneous conviction would not be quite as serious as would otherwise be the case").

Here, during the jury selection process, at 7 different times, the magistrate told the jury venire that Ray was being charged as a "felon in possession" of a firearm; and, that "felon" title was used in relation to questions about the jurors' beliefs that a defendant with a prior record had the propensity to commit the charged offense (Voir Dire Tr., RE 86, pp. 55, 92, 97, 106, 117-118, 124):

MAG.        Now, one of the charges in this case is felon in possession of a firearm. Does anyone believe that just because someone has been convicted before they are more likely to be guilty of the current charges? (Voir Dire Tr., RE 86, p. 55).

At this point in the voir dire, the jury panel engaged in a discussion about propensity evidence. The magistrate repeated her earlier question at a potential juror's request:

MAG.        Yes. I indicated that one of the charges in this case is felon in possession of a firearm. Does anyone believe that just because someone has been convicted before they are more likely to be guilty of the current charges? *Id*.

Two potential jurors responded very honestly by answering "yes" to the magistrate's question and adding the following:

JUROR F.    I just think it's, it's like, like you have a bad habit and if you do it once, then, I think you would, it would be easy to try to do it a second time. (Voir Dire Tr., RE 86, p. 56).

18

JUROR C.    Judge, can I just say that isn't it, wouldn't it be very human to say that that is a possibility if someone committed a similar crime in the past the likelihood of repeating that crime, I mean, wouldn't that be the human way to look at that?

I mean, and if the judge says, no, you are judging this solely on -- but doesn't everyone think, oh, he's done it before, so a possibility of repeating it is a, you know, a possibility. *Id.*

Potential Juror F indicated that he could decide the case on the evidence despite his expressed thoughts on propensity, but the Government asked to approach as side bar to express its concerns that the jury was being led to believe that Ray ". . . has been convicted of the same type of crime that he's charged with in this case . . . ." (Voir Dire Tr., RE 86, pp. 56-57). The magistrate then attempted to clarify to the potential jurors that the questions about a prior felony record were asked in general terms. *Id*. at 60. However, potential Juror C still held to the strong appeal of propensity, but indicated she could put that belief aside in this case. *Id*. at 60-61. Another potential Juror T agreed with potential Juror C. *Id*. at 61.

The magistrate went on during selection process, each time a challenge was exercised and a new potential juror was called from the venire panel:

MAG.    [O]ne of the charges in this is a **felon** in possession of a firearm, and do any of you believe that just because someone has been convicted of something before, they're more likely to be guilty of the current charge? (Voir Dire Tr., RE 86, p. 92).

And in terms of the charge in this case, one charge involved **felon** in possession of a firearm, any of you believe that just because someone's been convicted of something before they're likely to be guilty of the current charges? (Voir Dire Tr., RE 86, p. 97)

Again, it was indicated that this case involves a charge involving **felon** in possession of a firearm. Either of you believe that just because someone's been convicted before of something that they're more likely to be guilty of the current charge? (Voir Dire Tr., RE 86, p. 106).

You heard now several times that the case involved a charge of **felon** in possession of a firearm, either of you believe that just because someone has been convicted of something before that they're more likely to be guilty of the current charges?" (Voir Dire Tr., RE 86, pp. 117-118).

[ ] I had indicated the case involved a charge of **felon** in possession. (Voir Dire Tr., RE 86, p. 124).

The die was cast and the bell was wrung. The unfair prejudice and propensity evidence that was prohibited by *Old Chief, supra*, and Fed. R. Evid. 403 and 404(b), was introduced and discussed with the jury before the introduction of evidence began.

At trial, the jury heard the following testimony on direct examination from Ofc. Robson:

Q.    Okay. And what's the last question on this page?
A.    "Were you aware that you were a convicted felon?"
Q.    And what did he tell you?
A.    "Yes."

(Trial Tr. 1, RE 89, Page ID 694)

Q.    There's one more question and answer on there. Can you read that?

> A.  Yes. It looks like, "Were you aware that -- it looks like owning a firearm is against the terms of your release or having a firearm?" I can't quite read the writing.
> Q.  What's the answer?
> A.  "No."

*Id.* at 695.

Later during the trial, the Government read the following stipulation:

> GOVT.  Mr. Ray had been convicted of a felony, so that's a crime punishable by more than one year in prison, knew he had been convicted of a felony and had not had his conviction expunged or his rights restored and that we could call a witness to prove that if we had to.
>
> (Trial Tr. 1, RE 89, Page ID 758).

Significantly, the title "felon in possession" is not used in the statute itself: "It shall be unlawful for any person--(1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to . . . possess in or affecting commerce, any firearm or ammunition. . . ." 18 USC 922(g)(1).

The US Supreme Court addressed the issue of alternative means of proof in the unfair prejudice analysis:

> [A] reading of the companions to Rule 403, and of the commentaries that went with them to Congress, makes it clear that what counts as the Rule 403 "probative value" of an item of evidence, as distinct from its Rule 401 "relevance," may be calculated by comparing evidentiary alternatives. The Committee Notes to Rule 401 explicitly say that a party's concession is pertinent to the court's discretion to exclude evidence on the point conceded. Such a concession, according to the Notes, will sometimes "call for the exclusion of evidence offered to prove [the] point conceded by the opponent...." Advisory Committee's Notes on Fed. Rule Evid. 401, 28

21

U.S.C.App., p. 859. As already mentioned, the Notes make it clear that such rulings should be made not on the basis of Rule 401 relevance but on "such considerations as waste of time and undue prejudice (see Rule 403)...." *Ibid.* The Notes to Rule 403 then take up the point by stating that when a court considers "whether to exclude on grounds of unfair prejudice," the "availability of other means of proof may ... be an appropriate factor." Advisory Committee's Notes on Fed. Rule Evid. 403, 28 U.S.C.App., p. 860. The point gets a reprise in the Notes to Rule 404(b), dealing with admissibility when a given evidentiary item has the dual nature of legitimate evidence of an element and illegitimate evidence of character: "No mechanical solution is offered. The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof and other facts appropriate for making decision of this kind under 403." Advisory Committee's Notes on Fed. Rule Evid. 404, 28 U.S.C.App., p. 861. Thus the notes leave no question that when Rule 403 confers discretion by providing that evidence "may" be excluded, the discretionary judgment may be informed not only by assessing an evidentiary item's twin tendencies, but by placing the result of that assessment alongside similar assessments of evidentiary alternatives. See 1 McCormick 782, and n. 41 (suggesting that Rule 403' s "probative value" signifies the "marginal probative value" of the evidence relative to the other evidence in the case); 22 C. Wright & K. Graham, Federal Practice and Procedure § 5250, pp. 546–547 (1978) ("The probative worth of any particular bit of evidence is obviously affected by the scarcity or abundance of other evidence on the same point").

*Old Chief, supra,* 519 U.S. at 184-185.

The Defense in this case asked the trial court for a simple alternative:

Inform the jury that Ray is charged with being "ineligible" to possess a weapon,

and the Defense would stipulate that Ray did not have a license to carry a weapon

and that he was not eligible to carry a weapon. (Mtn. Limine, RE 49, Page ID 230-

231). That alternative to using the "felon" title would ensure that the jury would

only have to consider whether Ray "possessed" the weapon, eliminating any

prejudicial consideration of his felony status; and, that alternative would satisfy the holding in *Old Chief* that the trial court should us an equally probative but less unfairly prejudicial item of evidence that is available. *Old Chief, supra* 519 US at 180-183.

As the jury voir dire demonstrated, there is a bias and prejudice against felon offenders in the general public. Those biases are manifested in numerous ways, particularly in the way society disenfranchises felons and punishes them long after they have served their sentence. "In 48 states and the District of Columbia, all incarcerated persons are ineligible to vote. In addition, 35 states prohibit parolees from voting, 31 states do not allow felony probationers to vote, and in 14 states, a felony conviction can lead to loss of voting rights for life." (Addendum A - The Sentencing Project publication, September 2004, p. 2) (Addendum B - The Sentencing Project, "Felony Disenfranchisement Laws in the United States," updated April 2014).[2]

Just as in *Old Chief*, the cautionary instruction about limiting consideration of the defendant's prior record was not enough to cure the unfair prejudice. *Id*. at 176.

After the trial court's denial of his motions, Ray decided to testify at trial; and because of the trial court's prior rulings, the Defense preemptively disclosed

---

[2] Addenda A & B were linked and referred to in Mtn. Limine, RE 49, Page ID 230.

the fact that Ray had a prior felony record and that his prior felony conviction was also for a gun charge in 2005. (Trial Tr. 3, RE 91, Page ID 860, 892, 906, 928, 938). However, Ray's acknowledgment of his record and attempt to mitigate its effect cannot subsequently deprive him of the opportunity to challenge on appeal the district court's error. *U.S. v. Parrish*, 127 F.3d 1103, 3 (1997)(unpublished opinion)(Addendum C).

### B.     Prior Record.

It is unlawful for anyone "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" to "possess in or affecting commerce, any firearm...." 18 U.S.C. § 922(g)(1). Evidence of a prior felony conviction is relevant in a section 922(g)(1) prosecution because it is an element of the offense. However, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403.

The Court in *Old Chief* recognized that "where a prior conviction was for a gun crime or one similar to other charges in a pending case the risk of unfair prejudice would be especially obvious. . . ." *Old Chief, supra* 519 US at 185.

During Ray's testimony and the testimony of his other witnesses, the Defense preemptively disclosed the fact that Ray had a prior felony record and that

his prior felony conviction was also for a gun charge in 2005 because the trial court had denied his motions to suppress his record. (Trial Tr. 3, RE 91, Page ID 860, 892, 906, 928, 938).

Ray had been convicted of possessing a controlled substance, carrying a concealed weapon, and also being a felon in possession of a firearm in 2006, a federal conviction. Not only was the jury repeatedly informed that Ray was a "felon" during voir dire, they were also told, over Defense Counsel's objection, that he had been convicted of the same crime he was being charged with in this case. *Id*.

The Government relied on Fed. R. Evid. 609 as grounds for admitting Ray's prior record if he decided tot testify, but the trial court reserved its decision on this issue until trial. (Limine Hrg. Tr., RE 88, Page ID 614). At trial, the court would not allow the Government to use the prior controlled substance convictions from 1989; however, the trial court admitted use of the prior "felon in possession" charge under Fed. R. Evid. 609. (Trial Tr. 2, RE 90, Page ID 770-773).

For the purpose of attacking the credibility of a witness, Fed. R. Evid. 609(a) restricts the introduction of prior records:

> (1) evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative

> value of admitting this evidence outweighs its prejudicial effect to the
> accused . . . .

Fed.R.Evid. 609(a). Because unlawful possession of a firearm is not a crime of

dishonesty or false statement, Ray's record could only be introduced under Rule

609(1) if the court determined that the probative value of the evidence outweighed

its prejudicial effect. Unlike Fed. R. Evid. 403, in which probative evidence is

excluded only if its prejudicial value is *substantiall*y outweighed by the danger of

unfair prejudice, Rule 609(a)(1) creates in essence a presumption of unfair

prejudice, which has not been overcome in this case. *Parrish*, *supra* (Exhibit C).

In balancing the probity and prejudice of the evidence, the trial court must

consider: "(1) the impeachment value of the prior crime, (2) the point in time of the

conviction and the witness' subsequent history, (3) the similarity between the past

crime and the charged crime, (4) the importance of the defendant's testimony, and

(5) the centrality of the credibility issue." *U.S. v. Meyers*, 952 F.2d 914, 916–17

(6th Cir. 1992). The similarity of the prior crime and its temporal proximity

increase the prejudicial effect to the defendant. *Gordon v. United States*, 383 F.2d

936, 940 (D.C. Cir. 1967), cert. denied, 390 U.S. 1029 (1968).

Here, Ray's prior conviction for being a "felon in possession" was the exact

same charge that he faced at trial; it was only 6 years before this offense was

charged; and, there was no impeachment value other than propensity—any

impeachment value is substantially outweighed by the prejudicial impact. Ray's

conviction was not for a crime of theft, false statement, or dishonesty. There was

no showing that his prior conviction for the very same offense was probative of

any relevant element other than having a prior conviction.

At least one district court has held that

[ ] with regard to a indictment that only charges 922(g)(1) . . . , the government may not circumvent the rule in *Old Chief* and the defendant's stipulation, (either in its case in chief or in cross examination of the defendant or witnesses), under the guise of Federal Rules of Evidence 609(a)(1) or Federal Rules of Evidence 403. The Court still holds that in such cases, where the only charges against a defendant are 922(g)(1) charges, and where defendant has offered to stipulate to a qualifying felony, that the government is precluded from attempting to introduce the number, nature, name or substance of defendant's prior felony convictions under the aforementioned rules of evidence

*U.S. v. Campbell*, 2009 WL 595980, 2 (E.D. Tenn.)(unpublished opinion)(Addendum D).

*Campbell* applied *Old Chief* analysis to cases involving only charges of

section 922(g)(1) offenses; however, Ray's other counts of possession of

controlled substance with intent to deliver and possession of a firearm in the

furtherance of drug trafficking do not add to the theories of probative value for

admission by the Government.

The trial court abused its discretion and violated Ray's rights to due process

and a fair trial by admitting the prejudicial evidence of his prior conviction for

being a felon in possession of a firearm.

## II.    THE DEFENDANT'S RIGHT TO DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE US CONSTITUTION WAS VIOLATED BY HIS CONVICTION FOR POSSESSION OF A FIREARM IN FURTHERANCE OF A DRUG TRAFFICKING CRIME UPON INSUFFICIENT EVIDENCE AS A MATTER OF LAW.

**Standard of Review**.

The standard of review on appeal for an insufficient-evidence challenge is de novo: "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This Honorable Court will reverse a judgment for insufficient evidence if, after viewing the record as a whole, it concludes that the judgment is not supported by substantial and competent evidence. *U.S. v. Blakeney*, 942 F.2d 1001, 1010 (6th Cir. 1991)(citing *U.S. v. Ellzey*, 874 F.2d 324, 328 (6th Cir. 1989)).

The Defense preserved this issue for review by moving for a directed verdict of acquittal under Fed. R. Crim. P. 29 at the close of the Government's case. (Trial Tr. 3, RE 91, Page ID 855).

**Argument**.

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). It is the federal rule that a judgment of acquittal should be entered after the government's evidence is closed if the evidence is insufficient as a matter of law to sustain a conviction of the offenses charged. *Bryan v. United States* (1950), 338 U.S. 552, 558-559, 70 S.Ct. 317, 320(1), 94 L.Ed. 335, rehearing denied (1950), 338 U.S. 957, 70 S.Ct. 491, 94 L.Ed. 590.

Ray was charged in count four of the indictment with Possession of a Firearm in Furtherance of a Drug Trafficking Crime, which provides in relevant part as follows:

> [ ] any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime--(i) be sentenced to a term of imprisonment of not less than 5 years….
>
> 18 USC 924(c)(1)(A)(i).

The issue here is whether the Government sufficiently showed that Ray possessed the firearms "in furtherance" of a drug trafficking crime. The trial court read the following instruction:

> COURT.    The term "in furtherance of" means that the firearm was possessed to advance or promote the crimes charged in Count Two or Count Three or both and that the firearm was strategically located so that it was quickly and easily available for use." (Trial Tr. 4, RE 92, Page ID 1055).

In *U.S. v. Mackey*, 265 F.3d 457, 460-463 (6th Cir. 2001), this Court quoted the Judiciary Committee notes to section 924(c) regarding interpretation of the "in furtherance" language:

> [ ] The government must clearly show that a firearm was possessed to advance or promote the commission of the underlying offense. The mere presence of a firearm in an area where a criminal act occurs is not a sufficient basis for imposing this particular mandatory sentence. Rather, the government must illustrate through specific facts, which tie the defendant to the firearm, that the firearm was possessed to advance or promote the criminal activity.

> *Id*. at 460-463 (quoting H.R.REP. NO. 105-344 (1997), 1997 WL 668339, at 12 (footnotes omitted); and *United States v. Iiland,* 254 F.3d 1264, 1274 (10th Cir. 2001)(explaining that "in furtherance of" is a higher standard than "during and in relation to")).

The Judiciary Committee Report provides an illustration of an insufficient nexus between a firearm and drug crime by referring to the *Bailey v. United States*, 516 U.S. 137, 147, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995):

The facts of the Bailey decision ... provide a good example. The Committee believes that the evidence presented by the government in that case may not have been sufficient to sustain a conviction for possession of a firearm "in furtherance of" the commission of a drug trafficking offense. In that case, a prosecution expert testified at Mr. Bailey's trial that drug dealers frequently carry a firearm to protect themselves, as well as their drugs and money. Standing on its own, this evidence may be insufficient to meet the "in furtherance of" test. The government would have to show that the firearm located in the trunk of the car advanced or promoted Mr. Bailey's drug dealing activity. The Committee believes that one way to clearly satisfy the "in furtherance of" test would be additional witness testimony connecting Mr. Bailey more specifically with the firearm.

*Mackey*, *supra* 265 F.3d at 460-463 (quoting H.R.Rep. No. 105-344, 1997 WL 668339, at 12).

While the jury was deliberating, the trial court made observations regarding this element of the charge:

COURT.     I want to tell both of you, because I'm leaving at 2:30, if they find him guilty of this offense, I think it's still problematic because I don't think it's the rifle, it can't be the rifle, and it really can't be the shotgun because the shotgun standing in a corner in a bedroom upstairs is not likely to be used to protect the stash. (Trial Tr., 4, RE 92, Page ID 1069).

It is not likely to be used to protect the stash. It's just too big of a weapon to go and get shotgun shells if someone is going to attack you because the drugs were downstairs, the drugs were downstairs. Whether or not the firearm in the jacket was used in connection, I don't know. *Id*.

You know, the Supreme Court had a case in March about use of a firearm where there was an accessory, and you know it just reversed or sent back for reconsideration the firearm count in the motorcycle case in front of Judge Edmunds. So this requires a rather subtle analysis of the evidence going beyond the instruction.   *Id*.

\* \* \*

But you don't use them -- you sit around with a shotgun when you're running a still and you've got an outlier to protect you from anyone breaking into your still or you are running a drug house and you've got a guy at the door. There are all sorts of -- that's when you use a shotgun, but a shotgun is not a weapon commonly associated with self-protection in the circumstances of this case. (Trial Tr., 4, RE 92, Page ID 1070).

In addition to the trial court's observations, Ray's case is easily distinguishable from the facts in *Mackey, supra*, where the court found possession of the firearm in furtherance of drug trafficking. In *Mackey*, the police seized a loaded, short-barreled shotgun in the living room of a crack house, easily accessible to the defendant and located near electronic scales, a police scanner, and razor blades. *Mackey, supra* 265 F.3d at 462-463. The police also found $855 in cash. *Id*. at 459.  "The house did not appear to function as a residence: there were no implements, food, or other signs of use in the kitchen or bathroom, no furniture in the bedroom or the rest of the house aside from in the living room, and no clothes." *Id.* The front door was also barricaded. *Id*.

In this case, as the police pulled up to raid the house, Ray's son was playing basketball just outside. (Trial Tr. 1, RE 89, Page ID 657-658). The front door was open, and the police walked in without having to break through any security devices or reinforced doors. *Id*. at 658. Ray's bedroom window was open. *Id*. at 662. There was furniture throughout and the house was clean. *Id*. at 659.

In fact, the house was well lived in because it was Ray's home for 10 years. *Id*. at 780. There was a TV stand in the bedroom with a bed where Ray and Cara Lee were sleeping when the police raided. *Id*. at 662-663. The police allege that they found a shotgun behind the door in Ray's bedroom, but the shotgun was not loaded. *Id*. at 664. The police introduced photographs of the documents and bills found indicating that Genesee was Ray's residence. *Id*. at 744-745. The police found only $148 in Ray's bedroom with his other personal items. *Id*. at 741. The police did not find any scales to weigh drugs, nor did they find any police scanners. *Id*. at 712. Ofc. Pacholski admitted that the marijuana found in Ray's kitchen was consistent with personal use. (Trial Tr. 2, RE 90, Page ID 791).

The police found a loaded handgun in the pocket of a jacket inside a front closet near a another jacket with cocaine (Trial Tr. 1, RE 89, Page ID 676); however, Ray explained to the police the source of that cocaine and handgun coming from an intoxicated neighborhood friend during the birthday party the night before (Trial Tr. 1, RE 89, Page ID 691) (Trial Tr. 3, RE 91, Page ID 941-944, 956), and Ray never admitted to selling cocaine. (Trial Tr. 2, RE 90, Page ID 780).

Finally, the police only had the alleged evidence from a source of information that a single sale of 0.8 grams of marijuana took place at the Genesee residence. (*Franks* Hrg. Tr., RE 38, Page ID 119).

Ofc. Sloan testified that he himself could load a shotgun within seconds (Trial Tr. 2, RE 90, Page ID 805-806); however, there was no evidence that Ray could load a shotgun quickly, but there was evidence that the source of the weapon was Lee's deceased uncle (Trial Tr. 3, RE 91, Page ID 872-873, 878, 895, 904, 949-950), and that Ray was never seen with the shotgun. *Id*. at 872-874, 892, 909, 917, 935, 949-950.

Hence, the trial court expressed its doubts about the sufficiency of the evidence on this element of the offense because the evidence was insufficient and the jury also asked for clarification on that sole issue.

## III.    THE TRIAL COURT VIOLATED DEFENDANT'S RIGHT AGAINST SELF-INCRIMINATION UNDER THE FIFTH AMENDMENT TO THE US CONSTITUTION BY ADMITTING HIS INOLUNTARY STATEMENTS.

**Standard of Review**.

In the context of a denial of a motion to suppress, this Honorable Court reviews the district court's factual findings for clear error and its conclusions of law *de novo. United States v. Leake,* 998 F.2d 1359, 1362 (6th Cir. 1993); and *United States v. Dotson,* 49 F.3d 227, 229 (6th Cir. 1995).

The Defense preserved this issue for review by filing a pretrial motion to suppress Ray's statements made to the police. (Mtn. Suppress Confession, 10/23/13, RE 42)(Order Deny Mtn. Suppress Confession, 12/5/13, RE 45).

**Argument**.

The US Supreme Court has held that a suspect may waive his Miranda rights "provided the waiver is made voluntarily." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). "[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979).

In *Missouri v. Seibert*, 542 U.S. 600, 615, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), the Supreme Court suppressed the defendant's statements made after Miranda warnings because they were involuntarily made and tainted by prior pre-Miranda statements. *Id*. at 604-605. In *Seibert*, the police interrogated the defendant for 30 to 40 minutes, obtained a confession, took a 20 minute break, returned and gave *Miranda* warnings, and then continued to question the defendant about her pre-*Miranda* statements to get her to repeat the confession. *Id*. at 604–05, 124 S.Ct. 2601. The Court held that the mid-interrogation *Miranda* warning did not comply with *Miranda's* constitutional warning requirement because the

interrogation was nearly continuous and the warnings were intentionally withheld in order to procure a confession. *Id*. at 617.

The Court reached its decision to suppress the statement after deciding that the appropriate inquiry under such circumstances focuses on the voluntariness of the post-*Miranda* statements by consideration of the following factors: (1) completeness and detail of the initial interrogation; (2) overlap between the two statements; (3) timing and setting of the two interrogations; (4) continuity of interrogating personnel; and (5) degree to which the two interrogations were continuous. *Seibert*, *supra* 542 U.S. at 615.

*Miranda* warnings are required when a suspect is in custody and subject to interrogation. *Miranda* defined custody as the "[deprivation] of ... freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602.

Here, when the police raided Ray's home, they handcuffed him and the mother of his minor child, Cara Lee, placing them in the front room of the house while they processed evidence. (Trial Tr. 1, RE 89, Page ID 678). Ray was in custody for purposes of *Miranda* analysis.

"Interrogation" means "express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

36

The police admitted that they spoke with Ray and Lee while they were handcuffed in the front room. (Trial Tr. 1, RE 89, Page ID 678, 717-718)(Trial Tr. 2, RE 90, Page ID 789, 808). The police denied that they were talking with Ray about the guns and drugs. (Trial Tr. 1, RE 89, Page ID 714-716) (Trial Tr. 2, RE 90, Page ID 789). The police did admit that their conversation was about general information and Lee working at the County administration offices as a clerk. (Trial Tr. 1, RE 89, Page ID 714-716) (Trial Tr. 2, RE 90, Page ID 789).

However, Lee testified that she asked the police if she was going to jail in front of Ray while in the front room. (Trial Tr. 3, RE 91, Page ID 871). Ray spoke to Ofc. Hill (who later died and was not available for testimony) about Lee going to jail and then took responsibility for the shotgun and marijuana in order to spare Lee from being arrested in front of their son and charged with a felony that would destroy her career. *Id*. at 877, 958-959, 962-963. And Ray's testimony is supported by the fact that the police released Lee at the house when they had enough evidence to arrest her, too. *Id*. at 961. Further, Further, Ray's minor son was present outside. (Trial Tr. 1, RE 89, Page ID 657-658).

At the very least, under those coercive conditions, Ray's conversation with the police was the "functional equivalent" of interrogation. *Innis*, *supra* 446 U.S. at 300–301.

Just one-and-a-half hours later, the police read the *Miranda* warnings to Ray at the police station and took his statement (Trial Tr. 1, RE 89, Page ID 681-684, 688), and Ray made the same involuntary admissions again that he made at the house—that the shotgun belonged to him and he sold marijuana. *Id*. at 693 (and see Ray's Statement, RE 24-4, Page ID 66-68). (Ray was told at the house that the shotgun was allegedly found in bedroom behind the door by Ofc. Hill. (Trial Tr. 3, RE 91, Page ID 985).

Regarding the *Seibert* factors, Ray gave a complete confession and statement at the house by stating that the shotgun and marijuana was his—while handcuffed and perceiving the threat of Lee's arrest; Ray's statement was the same later, adding explanations about the cocaine and pistol; the second interrogation took place just one-and-a-half hours later and involved the same officers that he spoke to at the house; and, the two interrogations were continuous because they were close in time, involved the same police personnel, and the very same subject matter.

Those factors weigh in favor of suppressing the second statement that was tainted by the first involuntary statement made without *Miranda* warnings.

**IV.   THE TRIAL COURT ABUSED ITS DISCRETION AND VIOLATED DEFENDANT'S RIGHTS TO BE FREE FROM UNREASONABLE SEARCHES, DUE PROCESS, A FAIR TRIAL, AND PREPARE HIS DEFENSE UNDER THE FOURTH, FIFITH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE US CONSTITUTION BY DENYING DISCOVERY OF INFORMATION RELATED TO THE POLICE INFORMANT.**

**Standard of Review**.

This Honorable Court reviews the district court's decision for an abuse of discretion. *United States v. Jenkins*, 4 F.3d 1338, 1341 (6th Cir. 1993).

The Defense preserved these issues for review by filing pretrial motions that were denied by the trial court. (*Franks* Mtn., RE 23, Page ID 36-44)(Order Deny Franks Mtn., RE 31, Page ID 82-88); and (Mtn. Discovery, RE 40, Page ID 156-165)(Order Deny Mtn. Discover, RE 45, Page ID 204-210).

**Argument**.

In *Roviaro v. U.S.*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), the Supreme Court recognized the government's limited privilege to withhold the identity of informants from public disclosure in certain situations, but held that the privilege did not apply where "the disclosure of an informer's identity, or of the contents of his communication, [was] relevant and helpful to the defense of an accused, or [was] essential to a fair determination of a cause. . . ." *Id*. at 60–61.

The Court noted several factors for consideration in determining whether the public's interest in "protecting the flow of information" outweighed "the defendant's right to prepare a defense," *United States v. Beals*, 698 F.3d 248, 269 (6th Cir. 2012), including "the crime charged, the possible defenses, [and] the possible significance of the informer's testimony[,]" *Roviaro, supra* 353 U.S. at 62.

The *Roviaro* Court found the charged offense, facilitating the transportation of drugs, was "so closely related to the [informant] as to make his identity and testimony highly material," when the informant committed the same acts and was involved in the same activity for which the defendant was charged, and thus required disclosure of the informant to the defendant. *Id*. at 63–64.

In a pretrial motion for discovery, Ray's Defense moved the trial court to order the Government to produce the source of information (SOI # 2149) for pre-trial interview by the Defense or for an *in camera* interview; information about the number of times the SOI has aided or worked for the Government; the number of arrests and or indictments that were issued based upon the SOI's assistance; monetary payment or benefits; and the rough notes, logs, and any photographs regarding the alleged controlled buy and the SOI's criminal record. (Discovery Mtn., RE 40, Page ID 158).

The trial court denied the Defense discovery motion holding that Ray was making a motion to reconsider its decision on the earlier *Franks* hearing motion

(*Franks* Mtn., RE 23, Page ID 36-44), stating that Defendant was seeking to challenge probable cause to support the warrant and the affiant's truthfulness. (Order Deny Mtn., RE 45, Page ID 207).

The Defense was seeking disclosure of that information to support a motion to reconsider the trial court's earlier *Franks* decision; however, the Defense was also requesting that information for use at trial in his defense. (Discovery Mtn., RE 40, Page ID 158).

Specifically, the information about the SOI and the alleged controlled buy on August 22, 2013—the day of the birthday party and before the execution of the warrant—was relevant to whether Ray was a drug dealer and whether he was using firearms in furtherance of drug trafficking. The trial court instructed the jury that "the type of drug activity being conducted" is a factor relevant to the determination of whether the firearms was possessed in the furtherance of the crime. (Trial Tr. 4, RE 92, Page ID 1068).

Here, the SOI gave a description of someone similar to Ray, but never identified Ray specifically. (*Franks* Hrg. Tr., RE 38, Page ID 122). In his defense, Ray needed to show the jury that he was not the person answering the door and making the alleged sale. The information would also show the details of the sale, i.e., that it did not involve firearms or discussions about larger amounts of marijuana or cocaine. It would show who else was present, if anyone, and whether

the conditions of the sale indicated the kind of drug dealing associated with the need for firearms. It would also show how the drugs were packaged and transferred in relation to dealing, sharing among friends, or possession for personal use.

Although the SOI was not present during the execution of the warrant, just as in *Roviaro,* the SOI was "closely related" to all of the circumstances regarding whether or not this case involved possession or delivery/trafficking, and whether there was any use or indications of use of firearms to further the drug trafficking.

Finally, the trial court never reviewed *in camera* any of the information that the Defense requested before denying the motion for discovery.

**V.    THE TRIAL COURT CLEARLY ERRED AND VIOLATED DEFENDANT'S FOURTH AMENDMENT RIGHT TO BE FREE FROM UNREASONABLE SEARCHES BY ADMITTING EVIDENCE SEIZED UNDER AN UNLAWFUL WARRANT.**

**Standard of Review**.

On review of a district court's denial of a motion to suppress, this Honorable Court reviews findings of fact for clear error and conclusions of law de novo. *United States v. Beauchamp*, 659 F.3d 560, 565 (6th Cir. 2011). A finding of

probable cause is a legal conclusion that this Court reviews de novo. *United States v. Martin*, 526 F.3d 926, 936 (6th Cir. 2008).

**Argument**.

The Defense filed a pretrial motion under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). (*Franks* Mtn., RE 23, Page ID 36-44). The trial court held the *Franks* evidentiary hearing on February 29, 2013, and denied the Defendant's request to order the Government to produce information about the informant and to suppress the evidence seized at the Genessee address. (Order Deny *Franks* Mtn., RE 31, Page ID 88).

The Defense argued that the affiant for the search warrant, Officer Aaron Yopp, made the following materially false statements in support of the warrant:

> August 22, 2012, members of EDNEU met with SOI # 2149 to formulate a plan to make a controlled purchase of narcotics from the above location due to narcotics complaints. . . .The SOI was observed to go to the front door of the above location and stay for a short while. The SOI then returned directly to the narcotic members and handed over suspected marijuana and stated that he/she purchased the narcotics from above location and above seller.

> (Warrant & Aff., RE 23-1, Page ID 45).

Specifically, the Defense argued that there were no narcotics complaints made about the Genessee residence and that a controlled purchase of narcotics did not take place on August 22, 2012.

In support of his argument, Defendant Ray submitted an affidavit stating that he lived at the Genessee address and that "It is my belief that no one purchased

marijuana from the Genessee address on August 22, 2012." (Ray Aff., RE 23-2,

Page ID 46). Also, at the *Franks* hearing, Defense Counsel told the trial court that

> I have here Mr. Roy McAllister, who is an investigate with my office. One of the statements that was made in the search warrant affidavit was that numerous complaints had been received against this Genessee Street address, which was the subject of the search warrant, and my investigator, Mr. McAllister, who is a retired Detroit police officer, who I believe was head of Homicide at one point, who worked with Internal Affairs, I asked him to go to the Detroit Police Department and to inquire whether complaints had been made into this address as stated in the Search Warrant Affidavit, and my investigator, who is here for questioning, came back and reported that he had gone to the Detroit Police Department and there were no reports of complaints listed.

> (*Franks* Hrg. Tr., RE 38, Page ID 101-102).

The trial court did not hear any testimony from the Defense Investigator, but made its decision after testimony from Officer Yopp that was consistent with the statements in his affidavit. *Id.* at 9-45.

The Sixth Circuit has "ruled that the standards of 'deliberate falsehood' and 'reckless disregard' set forth in *Franks* apply 'to material omissions, as well as affirmative falsehoods." *United States v. Kennedy*, 131 F.3d 1371, 1376 (6th Cir. 1997) (quoting *Stewart v. Donges*, 915 F.2d 572, 582 (10th Cir. 1990)). If, after the false statements are excised, the affidavit does not support a finding of probable cause, the items found in the search should be suppressed. *Franks*, 438 U.S. at 171.

Here, the alleged narcotics complaints relied upon in the affidavit were not recorded, nor could Officer Yopp remember any specifics about the source or

approximate date that he received them. (*Franks* Hrg. Tr., RE 38, Page ID 122-125). The date would be crucial to determining if the information supporting probable cause had become stale.

In addition, Yopp did not conduct any prior surveillance of the Genessee residence in response to the alleged complaints, he did not conduct any other investigation before using an SOI, and he did not see the alleged controlled buy take place. *Id.* at 137, 139. There was only an alleged single purchase of 0.8 grams of marijuana in this case from a person who was never formally identified by the SOI, just given a description. (Warrant & Aff., RE 23-1, Paged ID 45).

At a suppression hearing, the Government bears the burden in establishing admissibility of the evidence by a preponderance, *Lego v. Twomey*, 404 U.S. 477 (1972), and that burden was not met in this case after excising the materially false statements that the police received narcotics complaints and that a controlled buy of narcotics took place at the Genessee residence on August 22, 2012.

**VI.   THE TRIAL COURT COMMITEED REVERSABLE ERROR
ENTITLING DEFENDANT TO A NEW TRIAL WHEN IT
DEVIATED FROM REREADING THE STANDARD JURY
INSTRUCTION WHEN THE JURY SOUGHT CLARIFICATION OF
"ADVANCE AND PROMOTE" AS IT RELATED TO THE
POSESSION OF THE WEAPON(S).**

**Standard of Review**.

A district court's response to questions from the jury is reviewed under the

abuse-of-discretion standard. *U.S. v. Fisher*, 648 F.3d 442, 446-447 (6th Cir. 2011).

The Defense preserved this issue for review by objection at trial. (Trial Tr. 4,

RE 92, Page ID 1067).


**Argument**.

This court "must review jury instructions as a whole in order to determine

whether they adequately inform the jury of the relevant considerations and provide

a sound basis in law to aid the jury in reaching its decision." *United States v. Clark*,

988 F.2d 1459, 1468 (6th Cir. 1993). "There is a high standard for reversal of a

conviction on the grounds of improper instructions. Under this standard, an

appellate court may reverse a judgment only if the instructions, viewed as a whole,

were confusing, misleading, and prejudicial." *United States v. Young*, 553 F.3d

1035, 1050 (6th Cir. 2009) (citation and internal quotation marks omitted).

During deliberation in this case, the jury submitted a request for further instruction and definition of the phrase "advance and promote" in relation to the charge of possessing a firearm in the furtherance of a drug trafficking crime. (Trial Tr. 4, RE 92, Page ID 1064).

In response, the Government requested language from the *US v. Mackey* case, *supra*. (Trial Tr. 4, RE 92, Page ID 1066). Defense Counsel did not want to further instruct the jury, but instead refer them to the trial court's earlier instruction using "advance and promote" to define "in furtherance of" (*Id*. at 1055). However, the following exchange took place after the trial court engaged in a discussion with the Government and then ignored Defense Counsel's objection and attempt to complete the record:

| | |
|---|---|
| DEF. COUNSEL. | Well, then, of course, we have here generally the mere possession of a firearm -- |
| GOVT. | He already said that. |
| COURT. | Yes, I'm going to say that. I'm going to say, "Mere possession is not sufficient. There must be a connection between the firearm and the drugs." |
| DEF. COUNSEL. | Judge, can I have my two cents' worth, please? |

(Trial Tr. 4, RE 92, Page ID 1066-1067).

The trial court read the following to the jury in response to their question:

Okay. I think the words, to me, "advance and promote" are sufficient. They are words of ordinary and common usage and they have their ordinary and common meaning, but I'll try and help you a little bit.

Mere possession is not sufficient. There must be a connection between the firearm and the drugs which are the subject matter of the drug offense. For example, the firearm, you should consider whether or not it is strategically located so that it is quickly and easily available for use. Again, other factors may be relevant to a determination of whether the weapon was possessed in furtherance of the crime, including, for example, whether the firearm was loaded, the type of firearm, the legality of its possession, the type of drug activity being conducted, and the time and circumstances under which the firearm was found. So those are the things you think about as you deliberate and come to a conclusion. (*Id*. at 1068)

By deviating from the standard jury instruction, the court unnecessarily confused and muddled the definitions and explanations that the jury was seeking. The Standard Instructions are what legal scholars and courts and concluded is the most effective and useful tool to convey complication legal concepts to the jury, who in most cases has no legal training or expertise in this area.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons Defendant-Appellant respectfully requests this Honorable Court to reverse, set aside the conviction and dismiss the indictment; or alternatively, reverse, set aside the conviction and remand this matter to the district court for a new trial along with suppressing Defendant's prior record and use of the title "Felon in Possession."

Date: January 5, 2015

Respectfully submitted,


By: s/Mark H. Magidson
MARK H. MAGIDSON (P25581)
Attorney for Defendant-Appellant
615 Griswold, Suite 810
Detroit, MI 48226
(313) 963-4311
mmag100@aol.com

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

(i) this brief contains no more than 14000 words, excluding the parts of the brief exempted by the Fed. R. App. P. 32(a)(7)(B)(iii) and 6th Cir. R. 32(b)(1) sections.

Dated: January 8, 2015

By: s/Mark H. Magidson
MARK H. MAGIDSON (P25581)
Attorney for Defendant-Appellant
615 Griswold, Suite 810
Detroit, MI 48226
313-963-4311
mmag100@aol.com

## CERTIFICATE OF SERVICE

I herby certify that on January 8, 2015, I electronically filed the ***Corrected Brief of Defendant-Appellant Alvin Ray*** with attached *Addenda A-D* with the Clerk of the US 6th Circuit Court of Appeals using the electronic file system, which will send notification of such filing to the parties of record.

By: s/Mark H. Magidson
MARK H. MAGIDSON (P25581)
Attorney for Defendant-Appellant
645 Griswold, Suite 2110
Detroit, MI 48226
(313) 963-4311
mmag100@aol.com

50

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

The Appellant, Alvin Ray, designates as relevant the following documents available in the district court's record, Case No. 2:13-cr-20143-1, in the Eastern District of Michigan:

**RECORD ENTRY NO.**          **DOCUMENT**                    **PAGE ID # RANGE**

RE 7.........................................Indictment.......................................................11-12

RE 23…………………………*Franks* Motion………………………………36-44

RE 23-1………………………Warrant & Affidavit……………………………....45

RE 23-2………………………Affidavit of Defendant…………………………..46

RE 24-4………………………Constitutional Rights Form…..…………....66-68

RE 31…………………………Order Deny Franks Motion…………………82-88

RE 38…………………………*Franks* Hrg. Trans, 7/29/14….…..101-102, 106,
                                                                108-110, 113, 119-
                                                        120, 122-125, 137-139

RE 40…………………………Discovery Motion…………………………156-165

RE 42…………………………Motion Suppress Confession…………………172

RE 45…………………………Order Deny Discovery
                                                & Suppression of Statement……………...204-210

RE 49…………………………Motion in Limine regarding
                                        "Felon" in Possession & Prior Record….…..230-234

RE 82…………………………Judgment, 9/4/14………..………..…..446-448

RE 83…………………………Notice of Appeal……………………………..453

RE 85………………………….Amended Judgment, 10/1/14…………….455-457

RE 86………………………Voir Dire Trans., 5/16/14, SEALED
                                            [No Page ID No.s]………..……….3-4, 55-57, 60-61, 92,
                                                                                          97, 106, 117-118, 124

RE 88………………………Motion *in Limine* Hrg.
                                            Trans., 2/18/14…………………….613-617, 621

RE 89………………………Jury Trial Trans. 1, 5/19/14…….655-659, 662-665,
                                            671, 676-678, 681-684,
                                            691-695, 708, 712, 714-
                                            718, 735, 741, 744-746,
                                            752, 758, 780, 791

RE 90………………………Jury Trial Trans. 2, 5/20/14……..770-773, 780, 789,
                                            805-808

RE 91………………………Jury Trial Trans., 3, 5/22/14………...855, 860-862,
                                            864-867, 871-878,
                                            892, 894-895, 897-898,
                                            904-909, 917, 922, 928-
                                            929, 935, 938-945, 948-
                                            951, 956-963, 979, 984-
                                            987

RE 92………………………Jury Trial Trans. 4, 5/23/14………...991-992, 1055,
                                            1064, 1066-1070,
                                            1072

RE 93………………………Sentencing Trans., 9/2/14……………….1082

ADDENDUM     A



514 10th Street NW, Suite 1000
Washington, DC 20004
Tel: 202.628.0871 • Fax: 202.628.1091
Staff@Sentencingproject.org
WWW.Sentencingproject.org

# THE VANISHING BLACK ELECTORATE:
# FELONY DISENFRANCHISEMENT IN ATLANTA, GEORGIA

## BY RYAN S. KING AND MARC MAUER

## SEPTEMBER 2004

This report was written by Ryan S. King and Marc Mauer, Research Associate and Assistant Director, respectively, of The Sentencing Project. The authors wish to thank the Georgia Department of Corrections for their assistance in providing data for the report. All findings and recommendations are solely the responsibility of the authors.

The Sentencing Project is a national non-profit organization engaged in research and advocacy on criminal justice policy issues. Funding for this project was made possible by support from the JEHT Foundation, Open Society Institute, and the Tides Foundation.

The Sentencing Project is a partner in the Right to Vote Campaign, a national campaign to remove barriers to voting faced by people with felony convictions. Further information can be found at www.righttovote.org.

Copyright © 2004 by The Sentencing Project. Reproduction of this document in full or part in print or electronic format only by permission of The Sentencing Project.

For further information:

The Sentencing Project
514 10th St. NW
Suite 1000
Washington, D.C. 20004
(202) 628-0871
www.sentencingproject.org

# THE VANISHING BLACK ELECTORATE:
# FELONY DISENFRANCHISEMENT IN ATLANTA, GEORGIA

## INTRODUCTION

In recent years, increasing attention has been directed to the policy of disenfranchising persons with a felony conviction, due in large part to a growing body of literature documenting the prevalence of disenfranchisement nationally and its particularly corrosive impact on citizenship and democratic rights in the African American community. The profile of the issue was raised significantly following the 2000 election, culminating in George W. Bush winning by a margin of 537 votes in Florida.[1] With research indicating that hundreds of thousands of persons in Florida were disenfranchised due to a prior felony conviction, as well as accusations of widespread fraud in the purging of additional eligible voters, the impact of disenfranchisement on voting and elections became clear to the American public.

Recent research suggests that prohibiting persons from voting due to a felony conviction has significance at the community level as well, particularly in areas of high concentration of disenfranchisement.[2] For persons in areas of high disenfranchisement, the dilution of a community's political voice is of particular concern when a large proportion of voting-age adults is prohibited from voting. Further, voting is a social and cultural activity, fostered through political awareness, discussion, and participation in a community. For persons living in communities of concentrated disenfranchisement, there is a reduced probability that such a political culture will emerge; rather, the risk of alienation from electoral politics due to ambiguity about registration and voting eligibility is increasingly likely.

Moreover, there are potential public safety costs to be considered, as persons struggling to transition back into the community from prison face a policy that prohibits their participation in an activity that reaffirms one's commitment to American political institutions. Instead, disenfranchisement questions a person's degree of citizenship and level of responsibility, and casts doubt on one's role in a participatory democracy.

---

[1] See Merzer, M. & Staff of the Miami Herald. (2001). *The Miami Herald Report: Democracy Held Hostage.* New York: St. Martin's Press; and Palast, G. (2003). *The Best Democracy Money Can Buy.* New York: Plume.

[2] Parkes, D. (2003). "Ballot Boxes Behind Bars: Toward Repeal of Prisoner Disenfranchisement Laws," *Temple Political & Civil Rights Law Review*, 13, Fall, 71-111.

**THE EXPANDING CRIMINAL JUSTICE SYSTEM AND FELONY DISENFRANCHISEMENT**

Examining the rapid acceleration of growth in the nation's correctional systems demonstrates why the policy of felony disenfranchisement has taken on such dimensions, and why its future impact, particularly in communities of color, is likely to be even more significant. Disenfranchisement laws are controlled at the state level, with each state determining which categories of felons are prohibited from voting. In 48 states and the District of Columbia, all incarcerated persons are ineligible to vote. In addition, 35 states prohibit parolees from voting, 31 states do not allow felony probationers to vote, and in 14 states, a felony conviction can lead to the loss of voting rights for life.[3]

In 1980, 1.8 million Americans were under some form of correctional supervision. That figure nearly quadrupled to 6.9 million in 2003, or 1 of every 32 adults. The implications for disenfranchisement are obvious. As of 2000, an estimated 4.7 million Americans were disenfranchised due to a current or past felony conviction; as the size of the correctional population continues to grow, this number will increase as well.[4]

The racially disparate impact of criminal justice policies results in exceptionally severe consequences for minority communities, including high rates of disenfranchisement. With nearly 10% of adult African Americans in the correctional system, the potential ramifications for political voice are obvious. Moreover, projections indicate that nearly one in five African Americans born today, and one in three black males, can expect to spend time in prison during their lifetime. This ratio understates the probability of an African American receiving a felony conviction, and subsequent disenfranchisement, during his or her lifetime since persons sentenced to felony probation are not included. As interaction with the correctional system approaches near inevitability in some communities, it is of increasing importance that we understand the multitude of ways in which the criminal justice system influences neighborhoods.

---

[3] Seven of these states permanently disenfranchise all persons convicted of a felony and seven permanently disenfranchise some persons based on category of offense, criminal history, or when the offense occurred. For a current list of categories of felons disenfranchised under state law, see Appendix B.

[4] Uggen, C. & Manza, J. (2002). "Democratic Contraction? Political Consequences of Felon Disenfranchisement in the United States," *American Sociological Review*, Vol. 67, December, 777-803.

### THE LOCALIZED IMPACT OF FELONY DISENFRANCHISEMENT

In recent years there have been two major studies providing estimates of the number of persons disenfranchised in each state.[5] This state-level analysis has been critical in establishing an understanding of the prevalence of disenfranchisement and has provided the empirical data necessary for a contemporary reevaluation of the policy. However, previous research does not permit a consideration of the impact of these policies in two key ways:

1) There is a need to assess the effects of disenfranchisement at the <u>local level</u>, particularly in communities acutely affected by incarceration. The state estimates, due to their level of aggregation, are not able to identify and measure these intra-state regional variations, thereby potentially obscuring significant concentrations of disenfranchisement in communities most seriously impacted by the criminal justice system.

2) Previous research has not examined the effect of disenfranchisement on actual <u>registration rates</u>, to assess the contribution of disenfranchisement to overall disparities in voter registration among different demographic groups.

This report examines these dynamics in the city of Atlanta and state of Georgia. The key findings are as follows:

- One of every eight (12.6%) black males in Georgia is disenfranchised as a result of a felony conviction. In Atlanta, the rate is one in seven (14%).

- Black male registration rates in Atlanta and Georgia are disproportionately affected by disenfranchisement policies. Half (49%) of the registration gap between black males and non-black males in the state of Georgia is a function of disenfranchisement; in Atlanta, more than two-thirds (69%) of the gap is accounted for by this practice.

- Nearly one-third (29.9%) of unregistered black males in Atlanta are legally ineligible to vote due to felony disenfranchisement.

- Black males in Atlanta are 11 times more likely than non-black males to be disenfranchised. In 11 neighborhoods in Atlanta, more than 10% of black males are disenfranchised.

- One-third of black male disenfranchisement in Georgia is a result of a felony conviction for a drug offense.

---

[5] Uggen & Manza, ibid.; Fellner, J. & Mauer, M. (1998). *Losing the Vote: The Impact of Felony Disenfranchisement Laws in the United States*. Washington, DC: Human Rights Watch and The Sentencing Project.

**DISENFRANCHISEMENT IN ATLANTA AND GEORGIA**

The city of Atlanta was selected as the site of this study because the state of Georgia maintains one of the most sophisticated databases of persons under correctional supervision. The Inmate Research File obtained from the Office of Planning and Analysis, Georgia Department of Corrections, contains detailed information on each individual in prison or on parole in the state of Georgia, including information on residence (either current or last reported at time of arrest). In addition, a separate datafile was obtained from the Department of Corrections, which contains similar data for all persons currently serving probation.

The state of Georgia lies in the mid-range of states nationally in terms of the restrictiveness of its disenfranchisement policy. Persons serving a felony sentence in prison or on probation or parole are prohibited from voting, but these rights are restored after the completion of one's sentence. Georgia is one of 17 states with such a disenfranchisement scheme. There are 14 states that are more restrictive through disenfranchising persons after completion of their sentence, and 19 states and the District of Columbia that are less restrictive through not removing voting rights for varying categories of prison, probation, or parole (see Appendix B).

_Overall Disenfranchisement Rates_

Table 1 shows disenfranchisement rates for the state of Georgia and the city of Atlanta as of September 2003:

- Of the 6 million Georgians of voting age, 3.3% are disenfranchised, a rate 43% higher than the national mean of 2.3%.

- In Atlanta, 5% of the voting age population is disenfranchised.

These figures, which include both genders and all races, understate the effect of disenfranchisement due to the concentrated impact of the correctional system. This is likely to be significant for African American men, who represent 45% of the prison population nationally, while only comprising 6% of the general population.[6]

To quantify the impact on the communities most likely to be affected by disenfranchisement policies, we divide these populations into black males and non-black males.[7] As illustrated in Table 1, we see the following:

---

[6] Corrections figures from Harrison, P.M. & Beck, A.J. (2003). _Prisoners in 2002_. Washington, DC: Bureau of Justice Statistics. NCJ 200248; Population figures from McKinnon, J. (2003). _The Black Population in the United States: 2002_. Washington, DC: U.S. Census Bureau.

[7] "non-black males" includes black females. While black females, Latinos, and other populations may be disproportionately affected by disenfranchisement, we analyze the impact on black males here due to their disproportionate rate of representation under correctional supervision and because data on ethnicity is often less reliable than race.

- For African American men, the state rate of disenfranchisement is 12.6% of the voting age population, or one of every eight adult men. This figure is nearly four times the state average and more than six times the rate for non-black males.

- For the city of Atlanta, the rate is 14%, or one of seven adult black men; this rate is nearly eight times as great as for all others in the city.

**Table 1-Felony Disenfranchisement in Georgia and Atlanta**

| Race & Gender | Voting Age Population | # Disenfranchised | % Disenfranchised |
|---|---|---|---|
| *GEORGIA* | | | |
| Total | 6,086,646 | 199,972 | 3.3 |
| Non Black Males | 5,342,052 | 105,820 | 2 |
| Black Males | 744,594 | 94,152 | 12.6 |
| *ATLANTA* | | | |
| Total | 323,470 | 16,061 | 5 |
| Non Black Males | 240,209 | 4,372 | 1.8 |
| Black Males | 83,261 | 11,689 | 14 |

_Impact on Voter Registration_

We next explore the impact of these practices on voter registration. As seen in Table 2, registration rates for black males are considerably lower than for non-black males. For the state as a whole, 51.4% of black males are registered, compared to 64.1% for all other populations. In Atlanta, the difference is 53% versus 63.9%.

**Table 2-Georgia and Atlanta Registration Rates**

| Race & Gender | Voting Age Population | # Registered | % Registered |
|---|---|---|---|
| *GEORGIA* | | | |
| Total | 6,086,646 | 3,807,851 | 62.6 |
| Non Black Males | 5,342,052 | 3,424,860 | 64.1 |
| Black Males | 744,594 | 382,991 | 51.4 |
| *ATLANTA* | | | |
| Total | 323,470 | 197,585 | 61.1 |
| Non Black Males | 240,209 | 153,453 | 63.9 |
| Black Males | 83,261 | 44,132 | 53 |

These registration rates, though, are based on the *total* adult population in each group. However, since substantial numbers of people in Georgia are legally *ineligible* to vote due to felony disenfranchisement, it is more revealing to calculate registration rates based on the *eligible* adult population. Tables 3 and 4 provide the results of this analysis. By removing persons who are prohibited from voting from the voting age population count, the adjusted rate includes only *eligible* voters and provides a more precise reflection of

registration patterns. Table 4 summarizes both approaches as a means of illustrating the significance of disenfranchisement in altering the appearance of registration rates:

- The statewide gap in registration between black males and non-black males drops by half (from 12.7% to 6.5%) once ineligible voters have been removed from the equation.

- In Atlanta, the change is even more dramatic – more than two-thirds (69%) of the difference in registration rates (10.9% vs. 3.4%) can be explained by felony disenfranchisement.

**Table 3-Georgia & Atlanta Registration and the Impact of Disenfranchisement [8]**

| Race & Gender | Voting Age Population | # Disenfranchised | # Eligible to Register | # Registered | % Registered (of all persons legally eligible) |
|---|---|---|---|---|---|
| *GEORGIA* | | | | | |
| Total | 6,086,646 | 199,972 | 5,886,674 | 3,807,851 | 68.1 |
| Non Black Males | 5,342,052 | 105,820 | 5,236,232 | 3,424,860 | 65.4 |
| Black Males | 744,594 | 94,152 | 650,442 | 382,991 | 58.9 |
| *ATLANTA* | | | | | |
| Total | 323,470 | 16,061 | 307,409 | 197,585 | 64.3 |
| Non Black Males | 240,209 | 4,372 | 235,837 | 153,453 | 65.1 |
| Black Males | 83,261 | 11,689 | 71,572 | 44,132 | 61.7 |

**Table 4-Adjusted Registration Rates Accounting for Eligibility**

| Registration | Non Black Males | Black Males | Difference |
|---|---|---|---|
| *GEORGIA* | | | |
| Registration Rate | 64.1 | 51.4 | 12.7 |
| Eligible Registration Rate | 65.4 | 58.9 | 6.5 |
| *ATLANTA* | | | |
| Registration Rate | 63.9 | 53 | 10.9 |
| Eligible Registration Rate | 65.1 | 61.7 | 3.4 |

---

[8] Voter registration data from Georgia Secretary of State's office; voting age population data from Census Population Projection State Files 2001-2005, datafile GA0105.ASC.

Table 5 presents another means of measuring the magnitude of suppressed registration attributable to disenfranchisement:

- In Georgia, one of every 18 (5.5%) unregistered non-black male voters is ineligible to vote due to a felony conviction. However, for black males, one of every four (26%) unregistered voters has a felony conviction.

- In Atlanta, the disparities are even greater. Nearly one in three (29.9%) unregistered black males is disenfranchised compared to one in 20 (5%) non-black males.

**Table 5-Voter Registration and the Impact of Disenfranchisement**

| Race & Gender | # Unregistered | # Disenfranchised | % Unregistered due to Felony Conviction |
|---|---|---|---|
| *GEORGIA* | | | |
| Total | 2,278,795 | 199,972 | 8.8 |
| Non Black Males | 1,917,192 | 105,820 | 5.5 |
| Black Males | 361,603 | 94,152 | 26 |
| ATLANTA | | | |
| Total | 125,885 | 16,061 | 12.8 |
| Non Black Males | 86,756 | 4,372 | 5 |
| Black Males | 39,129 | 11,689 | 29.9 |

*Impact on Voter Turnout*

The impact of these disenfranchisement rates can be seen in national surveys of voter turnout. As seen below, the rate at which black males voted in the 2000 election was more than five percentage points below that of white males and also significantly lower than that of black and white females. While our analysis of registration rates only applies to Georgia, it is likely that similar impacts would be found nationally, thereby contributing to the lower voter turnout of black males generally.

**Table 6-Voter Participation in 2000 Election[9]**

| | Male | Female |
|---|---|---|
| Black | 45.9 | 52.3 |
| White | 51.3 | 54.1 |

---

[9] Tierney, J. (2004, July 18). Political Points. *The New York Times*, Section 1, p. 23.

**DRUG POLICIES AND DISENFRANCHISEMENT**

While Georgia's disenfranchisement policies, as in other states, apply to persons convicted of a felony, the role of drug offenses in this regard is particularly significant. This is due both to the sheer scale of drug prosecutions and to the choice of methods adopted by which to respond to drug abuse issues.

As seen below, an estimated 30.8% of all persons under correctional supervision in Georgia have been convicted of a drug offense as their most serious charge.[10]  For black males, this figure is over 31,000, representing 33.3% of all offenses for which black males are currently under correctional supervision.  Thus, one-third of current black male disenfranchisement in the state is a direct result of drug law enforcement.

**Table 7-Drug Offenders Under Correctional Supervision**

|  | Drug Offense | Non-Drug Offense |
|---|---|---|
| **Non-Black Males** | **30,153  (28.5%)** | **75,667  (71.5%)** |
| **Black Males** | **31,332  (33.3%)** | **62,820  (66.7%)** |
| **GEORGIA** | **61,485  (30.8%)** | **138,487  (69.2%)** |

Unlike many other offenses, drug law enforcement is highly discretionary.  When persons have been victimized by theft, robbery, or assault, they generally report these crimes to police, which leads to an investigation and possible arrest.  However, most drug offenses do not result in reports to police.  Neither parties engaged in a drug transaction nor persons using drugs have any interest in reporting their behavior to police.  Therefore, most drug arrests result from decisions made by political and law enforcement leaders to respond to drug offenses through use of the criminal justice system.  For these reasons, criminologist Alfred Blumstein has noted that arrest rates for drug offenses are not likely to mirror use patterns in the general population, but rather are reflective of policy decisions because "non-whites are more vulnerable than whites to arrest for drugs" due to "a more dense police presence where blacks reside."[11]

The discretionary nature of this decision can be seen in two respects.  First, a range of options, including investments in prevention and treatment, exist by which to deal with drug problems.  How local officials balance resources between prevention and arrest has significant consequences both for dealing with drug abuse and for the growth of the criminal justice system.  Second, to the extent that law enforcement is used to address drug problems, there is a range of decisions to be made.  These include whether to target only high-level dealers or all users, whether to employ mandatory sentencing policies or to make greater use of drug courts, and other issues.  The outcome of these decisions will affect, among other things, the number of persons who lose their right to vote.

---

[10] Drug offender data obtained September 2003 from the Georgia Department of Corrections Office of Planning and Analysis (Inmate Research File and Probation Data File).

[11] Blumstein, A. (1993).  "Racial Disproportionality of U.S. Prison Populations Revisited," *University of Colorado Law Review*, Vol. 64, pp. 743-760.  (p. 753).

**NEIGHBORHOOD DISENFRANCHISEMENT IN ATLANTA**

Just as we have seen variation in disenfranchisement rates for the state as a whole and for the city of Atlanta, so may we expect to see variation in these rates within Atlanta. The Atlanta metropolitan area is in the mid-range of large metropolitan areas in terms of residential segregation patterns.[12] In combination with the racial disproportionality of the Georgia correctional system, we would therefore expect to see an even more pronounced impact of disenfranchisement in Atlanta neighborhoods that are predominantly comprised of people of color.

As noted above, for our analysis we defined Atlanta neighborhoods[13] by zip code.[14] Atlanta has 105 separate zip codes, 42 of which are for standard residential or business use. The remaining 63 zip codes are defined as *unique* (e.g., a zip code reserved for a large entity such as an office park or building) or for post office box use only. For the purposes of this analysis, only the 20 standard zip codes that are geographically nested within all or a portion of the Atlanta city limits were included.[15]

There is a great degree of variation in the racial and economic make-up of the Atlanta neighborhoods in this analysis. Neighborhoods ranged from 1.8% non-Hispanic black to 97.8% non-Hispanic black and from 0.5% non-Hispanic white to 93.4% non-Hispanic white. Median household income ranged from $13,084 to $114,674 and the poverty rates for the sample neighborhoods were between 2.7% and 45%. These basic social indicators demonstrate that the 20 sample neighborhoods in this study are of diverse racial and economic backgrounds, and are reflective of the diversity of the city as a whole.

Table 8 shows the disenfranchisement rates for Atlanta by zip code. Of the 20 neighborhoods, 11 have more than 1% (or 1,000 per 100,000 persons) of the population currently in prison or on felony probation or parole. The third and fourth columns display the percentage of each neighborhood's population that is African American and the percentage living below the poverty line. A cursory examination of Table 8 indicates the appearance of a relationship between disenfranchisement rates, the density of the African American population, and percent living in poverty. The neighborhoods with the lowest disenfranchisement rates generally correspond with lower population density of

---

[12] Atlanta ranks 26th in overall segregation and 11th on the Census' Isolation Index. Iceland, John and Weinberg, Daniel H. *Racial and Ethnic Residential Segregation in the United States: 1980-2000*. August 2002. Washington, DC: U.S. Census Bureau.

[13] Hereafter, all references to "neighborhood" are in reference to the zip code defined neighborhoods used in the analysis.

[14] See Appendix A for an in depth discussion of the implications and assumptions inherent in using zip code as a proxy for neighborhood.

[15] Although the United States Postal Service assigns 105 zip codes to Atlanta, only 13 nest entirely within the Atlanta city boundaries, while an additional seven overlap the border between Atlanta and neighboring jurisdictions. In order to estimate the proportion of each zip code that is contained in Atlanta, zip code and city correspondence data from *MABLE/Geocorr2K: Geographic Correspondence Engine* was employed. Additional information available online at mcdc2.missouri.edu/websas/geocorr2k.html

African Americans as well as a lower poverty rate. We will explore this association further by using correlations to test this relationship statistically.

**Table 8 - Disenfranchisement Rate (per 100,000) by Zip Code**
**Total Population**

| Zip Code | Disenfranchisement Rate | Percent Black | Percent Poverty |
|---|---|---|---|
| 30327 | 370 | 1.8 | 2.7 |
| 30305 | 525 | 3.9 | 7 |
| 30306 | 748 | 5.9 | 6.9 |
| 30328 | 824 | 10.8 | 5.9 |
| 30309 | 988 | 15.1 | 11.9 |
| 30324 | 1,194 | 10.4 | 10.8 |
| 30313 | 1,752 | 36.3 | 45 |
| 30307 | 2,045 | 24.7 | 11.9 |
| 30308 | 2,650 | 45.5 | 25.8 |
| 30342 | 2,887 | 7.3 | 8.2 |
| 30311 | 4,050 | 94.5 | 25.1 |
| 30312 | 4,296 | 68.5 | 38.1 |
| 30318 | 4,617 | 67.7 | 31.4 |
| 30331 | 5,149 | 94.6 | 19.1 |
| 30314 | 5,221 | 97.8 | 36.9 |
| 30315 | 5,868 | 77.3 | 41.2 |
| 30310 | 6,188 | 92.1 | 30 |
| 30354 | 6,781 | 69.6 | 26 |
| 30317 | 6,867 | 85.1 | 24.2 |
| 30316 | 11,580 | 79.6 | 21.8 |

Mean: 3,730 per 100,000

Table 9 illustrates the racial breakdown by zip code. It is readily apparent that black males experience the correctional system at a disproportionate frequency. Whereas 11 of the 20 neighborhoods have a disenfranchisement rate over 10,000 per 100,000 black males (10% or more), no neighborhoods have more than 4,000 per 100,000 non-black males (4%) disenfranchised. In one neighborhood (zip code 30316) more than a quarter (27.1%) of black males are disenfranchised. In another (zip code 30342) one of every five (20.8%) is ineligible to vote.

An analysis of the mean disenfranchisement rate for neighborhoods in Atlanta further illustrates the profound impact of this policy on African American men. While the overall mean disenfranchisement rate by neighborhood in Atlanta is 3,730 per 100,000 residents, and the rate for non-black males is 1,284 per 100,000, or approximately 1.3% of non-black males, for black males the mean neighborhood disenfranchisement rate is 11,870 per 100,000, or 11.9% of black males.

10

**Table 9 - Disenfranchisement Rate (per 100,000) by Zip Code**

| Zip Code | Black Males Disenfranchisement Rate | Non Black Males Disenfranchisement Rate | Ratio – Black Males : Non Black Males |
|---|---|---|---|
| 30314 | 9,808 | 1,502 | 6.5 |
| 30316 | 27,146 | 3,916 | 6.9 |
| 30310 | 12,172 | 1,728 | 7 |
| 30309 | 4,713 | 654 | 7.2 |
| 30311 | 8,459 | 1,124 | 7.5 |
| 30315 | 13,676 | 1,812 | 7.5 |
| 30317 | 14,830 | 1,950 | 7.6 |
| 30331 | 10,666 | 1,358 | 7.7 |
| 30354 | 18,738 | 2,258 | 8.3 |
| 30318 | 11,965 | 1,356 | 8.8 |
| 30342 | 20,780 | 2,244 | 9.3 |
| 30308 | 9,534 | 873 | 10.9 |
| 30312 | 12,829 | 1,170 | 11 |
| 30328 | 6,299 | 566 | 11.1 |
| 30324 | 8,844 | 781 | 11.3 |
| 30306 | 6,631 | 555 | 11.9 |
| 30327 | 4,244 | 325 | 13.1 |
| 30307 | 15,906 | 717 | 22.2 |
| 30313 | 10,851 | 438 | 24.8 |
| 30305 | 9,310 | 351 | 26.5 |
| **Mean:**[16] | **11,870 per 100,000** | **1,284 per 100,000** | **11.4** |

Examining the ratio of each neighborhood's disenfranchisement rate for black males and non-black males, we find that the neighborhood with the smallest ratio still has a disenfranchisement rate for black males that is six times that of non-black males, and nearly half (9 of the 20 neighborhoods) have ratios in excess of ten. The mean neighborhood ratio is 11.4, indicating that black males are eleven times more likely to be disenfranchised than non-black males.

These results suggest, as expected considering the demographics of the correctional system, that the policy of felony disenfranchisement has a significantly disproportionate impact on communities of color, specifically African American males. Tables 1 through

---

[16] In Table 1, black males in Atlanta are estimated to have a 14% disenfranchisement rate, while the average of the neighborhoods in Table 9 is closer to 12%. This discrepancy is due to the different levels of aggregation in the calculation. In Table 1, the number is citywide, while the figure in Table 9 is generated by taking the average of 20 separate neighborhoods. The mean in Table 9 counts each neighborhood equally, not taking into account that some neighborhoods have larger populations, and hence, a larger impact on the overall citywide rate.

9 appear to indicate that there is a relationship between race and disenfranchisement, but to truly establish an association, a statistical test of correlation is necessary. A correlation coefficient measures the strength and direction of the linear relationship between two variables.[17]  A Pearson's correlation is measured on a scale of −1 to +1, with zero indicating no correlation and −1 and +1 indicating a perfect negative or positive linear relationship.  Generally, a coefficient below −.5 or above +.5 is considered quite strong.

Table 10 shows simple correlations between a neighborhood's percent black and the disenfranchisement rate.  The Pearson's correlation is a robust .8, a strong linear relationship.

**Table 10-Pearson's Correlation Coefficients-Percentage Black**

|  | Disenfranchisement Rate | Percentage Black |
|---|---|---|
| Disenfranchisement Rate |  | 0.8* |
| Percentage Black | 0.8* |  |

   ***=**p<.001

The Pearson's value for percent non-Hispanic white in Table 11 is -.806, a very strong relationship in the opposite direction.

**Table 11-Pearson's Correlation Coefficients-Percentage White**

|  | Disenfranchisement Rate | Percentage White |
|---|---|---|
| Disenfranchisement Rate |  | -0.806* |
| Percentage White | -0.806* |  |

   ***=**p<.001

In short, as the disenfranchisement rate increases, we can also expect to see the percent black in a neighborhood increase at a rate of 1:0.8.  To put it another way, as disenfranchisement increases, the percent non-Hispanic white decreases at a rate of 1:0.8.

---

[17] Agresti, A. & Finlay, B.  (1997).  *Statistical Methods for the Social Sciences (3ʳᵈ Edition)*.  New York: Prentice-Hall.

The following charts show these correlations graphically. Figure 1 shows neighborhoods sorted on an ascending disenfranchisement rate (left to right), with a line of the neighborhood's percent black fit over the chart. The left axis represents each neighborhood's disenfranchisement rate while the right axis corresponds to the line indicating the percent black of the neighborhood. The relationship discussed above as well as the correlations should be clear in this chart. As the bars representing the disenfranchisement rate grow, moving from left to right, the line indicating the percent black of the neighborhoods climbs at a relatively similar rate.

**Figure 1 – Disenfranchisement Rate (bars) and Percent Black (line)**



Figure 2 shows the same relationship, this time fitting a line for a neighborhood's percent white over the ascending disenfranchisement rate. In this case, as the disenfranchisement rate increases, the percent white in the neighborhood decreases, demonstrated statistically by the strong negative Pearson's coefficient in Table 11.

**Figure 2 – Disenfranchisement Rate (bars) and Percent White (line)**



The results of the Pearson's correlation do not imply causation, but they do indicate that we can expect to see high disenfranchisement rates in neighborhoods that are inhabited predominantly by African Americans.

14

**THE IMPLICATIONS OF FELONY DISENFRANCHISEMENT**

The impact of disenfranchisement extends beyond issues of criminal justice and touches upon fundamental principles of political participation in a democratic society. The consequences of these estimates affect the ability of communities to express their political voice. They also affect public safety and reintegration through actual and symbolic barriers to social participation.

*Vote Dilution*

Whereas felony disenfranchisement has its primary impact on individuals, it also exerts a vote dilution impact on particular communities. Given the concentration of felony disenfranchisement in primarily African American communities, persons who have not been convicted of a felony are affected through the diminished strength of their political voice. If neighborhoods are seen as potential voting blocs, sharing analogous experiences and likely to behave as a similar voting electorate, when a significant portion of that potential voting bloc is unable to participate, those remaining persons eligible to vote will have a diminished impact. For example, residents of Atlanta zip code 30327 (.37% disenfranchised and 2% African American), have a greater political voice than residents of zip code 30310 (6.2% disenfranchised and 92% African American) simply by virtue of there being more eligible voters in their district.

This disenfranchisement effect contributes to a vicious cycle within public policy development that further disadvantages low-income communities of color. The first means by which this occurs is through decisions on resource allocation. In citywide decisionmaking regarding spending for schools or social services, residents of certain neighborhoods will have considerably more political influence than others, solely because "one person, one vote" is distorted through the loss of voting rights.

At a state level, beleaguered communities are affected through a diminished impact on public policy. Consider, for example, the disproportionate effect of drug policy on African American communities. Nationally, the vast increase in incarcerated drug offenders, fueled in large part by a heavy emphasis on law enforcement patterns and punitive sentencing policies, has had a highly skewed impact on communities of color. Many political leaders in these communities are concerned about the problem of drug abuse, but have called for a more balanced approach that emphasizes prevention and treatment. Yet, because there are fewer voting residents in these neighborhoods – due in significant part to drug policies – these voices have increasingly less political influence.

*Chilling Effect on Political Engagement*

Disenfranchisement contributes to the disincentives for candidates for political office to devote time and attention to low-income communities of color while campaigning. Along with the fact that politicians do not receive significant campaign donations from

these neighborhoods, disenfranchisement results in fewer potential supporters.[18]  In the calculated economics of electoral campaiging, candidates spend time in areas perceived to have the highest concentration of potential voters.

This fact has significant consequences for democracy if, during a period in which politicians are likely to be at their most responsive, they are neglecting low income communities and communities of color.  Once in office, lawmakers will not be any more likely to be responsive.  Felony disenfranchisement threatens to exacerbate this problem; as the correctional system grows and more persons are prohibited from voting, the seriousness with which policymakers listen to demands from communities of color is likely to continue to diminish.

*Public Safety – Voting and Re-entry*

The policy of disenfranchisement, declaring that one's voting rights have been revoked, is one of a number of stigmatizing processes in place that serve to augment the challenges faced by persons with a felony conviction.  Disenfranchisement becomes a proxy for "otherness," making a person "an alien in his own country, and worse," and indicates "that former offenders are impure."[19]  By marginalizing one's status in society through policies that hinder employment prospects, housing availability, education, and voting, state institutions are used to a counterproductive end: making re-entry more difficult and increasing the likelihood of recidivism.  Data from the Bureau of Justice Statistics indicates that two-thirds of persons released from prison are re-arrested within three years and half return to prison during that period.[20]  The obstacles, both symbolic and practical, facing persons leaving prison are of no small consequence in augmenting these numbers.

Recent research by sociologists Christopher Uggen and Jeff Manza indicate that disenfranchisement has a tangible impact on the likelihood of future crime commission.[21]  Uggen and Manza "find consistent differences between voters and non-voters in rates of subsequent arrest, incarceration, and self-reported criminal behavior."[22]  For example, between 1997 and 2000, 16% of non-voters were arrested, compared to 5% of voters.[23]  Similar findings can be seen among persons with a record of prior arrest.  Between 1997 and 2000, 27% of non-voters were re-arrested, compared to 12% of voters.

Voting is both a highly symbolic as well as instrumental action in a participatory democracy.  Voting, or being permitted to vote, is an acknowledgement that one is an accepted member of society; an individual who belongs to a larger social collective.

---

[18] The Public Campaign.  (2003).  *Color of Money 2003: Campaign Contributions, Race, Ethnicity, and Neighborhood*.  Washington, DC: The Public Campaign.
[19] Harvard Law Review.  (1989).  "Note: The Disenfranchisement of Ex-Felons: Citizenship, Criminality, and 'The Purity of the Ballot Box'," *Harvard Law Review*, 102, April, 1300-1317.
[20] Langan, P.A. & Levin, D.J.  (2002).  *Recidivism of Prisoners Released in 1994*.  Washington, DC: Bureau of Justice Statistics.
[21] Uggen, C. & Manza, J.  (2004).  "Voting and Subsequent Crime and Arrest: Evidence from a Community Sample," *Columbia Human Rights Law Review*, Forthcoming.
[22] Ibid.
[23] A voter is defined as someone who voted in the 1996 election.

There is an obvious component of social and political bonding among members of an electorate. Accordingly, a prohibition of membership in the electorate produces the opposite result, shunning the disenfranchised individual and marking him or her as a partial citizen. In ruling on a challenge to disenfranchisement of people in prison, the South African Constitutional Court noted that "the vote of each and every citizen is a badge of dignity and of personhood. Quite literally, it says that every person counts."[24] Consequently, from the perspective of re-integration and sustainable public safety, electoral participation should be something that is encouraged, and its legal prohibition is harmful from a public policy vantage point.

---

[24] Sauve No. 2, (2002) 3 S.C.R. 519, para. 35 (citing August and Another v. Electoral Comm'n and Others, {1999} 3 S.A.L.R. 1, at para. 17) as cited by Parkes, 92.

**Policy Implications**

This report has focused on the effects of disenfranchisement in Georgia as a case study. As previously indicated, Georgia is very much in the mainstream of disenfranchisement practices around the nation.  Thus, the dynamics revealed in this report are likely to be representative of many states.

Felony disenfranchisement is a concern both for its practical impact and for its implications for a democratic society.  As we saw in the historic 2000 election in Florida, a presidential election was decided by 537 votes.  On the day of the election, an estimated 600,000 persons who had *completed* their felony sentence were unable to vote due to Florida's restrictive disenfranchisement policies.  There is no means of knowing how many of these persons would have voted or for whom they have voted if granted the opportunity, but clearly a national election may have been decided based on this policy.[25]

Disenfranchisement raises fundamental questions about the rationale for linking a criminal conviction with the loss of fundamental rights.  While conviction forf a felony may result in a sentence of imprisonment, probation, fines, and other obligations, it does not generally restrict the right to free speech, of which voting is clearly an element.  For example, persons living in the community under probation or parole supervision may write a letter to the editor, participate in a PTA organization, or attend a public rally.  This distinction was clearly framed by the American Bar Association in 2003, when it reaffirmed its longstanding principle that "persons convicted of any offense should not be deprived to the right to vote."[26]

Momentum for reform of disenfranchisement policies is growing at a national level.  In 2001, the National Commission on Federal Election Reform, co-chaired by former Presidents Ford and Carter, unanimously recommended that voting rights be restored to persons upon completion of a sentence.  A similar policy statement was approved by the American Correctional Association, the major professional group in its field, in 2001.

Many states have begun to reconsider disenfranchisement policies in recent years as well. Since 1997, nine states – Alabama, Connecticut, Delaware, Maryland, Nevada, New Mexico, Texas, Virginia, and Wyoming -- have scaled back or repealed aspects of their disenfranchisement policies.  Notably, these developments have been bipartisan – five of these bills were signed into law by Republican governors, and four by Democrats.

Disenfranchisement may be in violation of the Voting Rights Act due to its racially skewed impact.  In ruling on a challenge to disenfranchisement law in Washington state, the 9th Circuit Court of Appeals stated that the "totality of the circumstances" clause of the Voting Rights Act "requires courts to consider how a challenged voting practice

---

[25] Uggen and Manza (2002) model the 2000 presidential election in Florida and conclude that in the absence of disenfranchisement, Al Gore would have won Florida by 80,000 votes.  Even if only ex-felons were permitted to vote, Uggen and Manza conclude that Gore would have won by more than 60,000 votes.
[26] American Bar Association, Criminal Justice Standards on Collateral Sanctions and Disqualification of Convicted Persons, 2003.

*interacts with* external factors such as 'social and historical conditions' to result in denial of the right to vote on account of race or color."[27]   However, a ruling in the Southern District of New York challenging that state's disenfranchisement law found that the Voting Rights Act did not apply.   These issues may ultimately be heard in the U.S. Supreme Court.

International developments cast light on the extreme policies of the United States in this regard.   No other democratic nation disenfranchises all persons with a felony conviction after completion of sentence, as is done in seven states, and few do so for any period after sentence.   International support is also growing for policies that extend voting rights to all persons with felony convictions.   In recent years, constitutional courts in Canada, Israel, and South Africa have upheld the right of all persons to vote, including those in prison. In addition, in 2004, the European Court of Human Rights ruled that the blanket denial of voting rights to imprisoned persons in England and Wales was a violation of human rights.

---

[27] *Farrakhan v. Washington*, U.S. Court of Appeals for the Ninth Circuit, July 25, 2003.

**Recommendations**

Policymakers in Georgia and other states should consider the following recommendations to encourage greater participation in voting and expand the size of the electorate:

**Reconsider the scope of disenfranchisement laws** – State laws on disenfranchisement vary significantly, ranging from no disenfranchisement in Maine and Vermont to permanent disenfranchisement in 14 states (unless rights are restored by a governor or board of pardon). In many cases, these policies have been in effect for more than a century, with no recent review of their rationale. Given the substantial impact of these policies due to the vast expansion of the criminal justice system in recent decades, policymakers in all states should establish mechanisms by which to assess the practical effect of these policies.

**Expand voting to persons not currently incarcerated** – There are strong arguments for extending voting rights to all persons in the community, including those on probation or parole. First, disenfranchising such persons presents many practical challenges for election officials. In many states, database technology is not at a state at which election officials can be informed if a voter applicant is currently serving a felony sentence. In addition, persons on probation or parole often have difficulty obtaining the necessary paperwork to demonstrate that they have completed their sentence. For these reasons, permitting voting by all non-incarcerated persons would place the same requirements on registration for people on probation or parole as for any other potential voter.

Extending voting rights to these persons would also serve a rehabilitative function. As documented in this report, voting is one means of participating in the life of the community and as such, contributes to building positive connections. Thus, efforts to reduce recidivism among persons leaving prison should also incorporate voter outreach and eligibility.

**Expand the use of pardons to restore voting rights** – In some states (including Georgia) disenfranchisement is incorporated within the state constitution; legal scholars are often divided regarding whether this leaves room for statutory change on these policies in a given state. Nevertheless, whether lodged in a Governor or Board of Pardon, the constitutional pardon power may remit penalties and disabilities even for persons still under sentence. Thus the constitutional power to pardon could be used to allow individuals to seek restoration of voting rights even where the state constitution provides that convicted persons as a class lose that right. In Georgia, this could be accomplished by the Georgia Board of Pardon simply relaxing its pardon eligibility requirements to allow persons on probation or parole to regain their voting rights as soon as they leave prison. State officials should explore the feasibility of such a process in order to aid in reentry and to reduce the disproportionate impact of disenfranchisement.

**Aid persons leaving supervision in voter registration** – In most states there is virtually no assistance provided to persons leaving correctional supervision in regaining their voting rights. In contrast, one can look at the Motor Voter Law, which placed a national

priority on making voter registration readily accessible. Corrections officials should develop policies and practices that routinely inform persons under supervision of the means by which they can obtain voting rights upon leaving the relevant category of supervision in that state. The Georgia Board of Pardons and Paroles has recently agreed to display posters in all its offices informing persons of their right to vote once supervision is completed.

**Provide standardized training for elections officials** – A recent survey by the Brennan Center for Justice found that more than half of New York State's 62 boards of elections were improperly refusing to register persons with felony convictions unless they submitted certain unnecessary documents, many of which do not exist or are exceedingly difficult to obtain.[28] These obstructionist practices are illegal in New York, where voting restoration is automatic after an individual has completed a sentence. The situation in New York is not an anomaly; reports abound from states across the country of election officials demanding needless paperwork, providing incorrect information, or refusing to register eligible categories of people with felony convictions outright.[29] State officials should implement standardized practices in local boards of elections that ensure employees are knowledgeable of state requirements regarding voting rights for persons with felony convictions and should initiate procedural safeguards so as to protect an individual's right to register.

**Institute transparency in the voter purging process** – Despite the nationwide attention to the inaccurate voter purging practices in Florida in 2000, the *Miami Herald* reported that of the 47,000 persons listed in a 2004 Florida database of persons to be purged, 2,100 were incorrectly included, since they had had their rights restored. Evidence suggests that voter-purging procedures are often unable to reliably identify people who are legally prohibited from voting. Correctional and electoral bureaucracies often suffer from inefficiencies in sharing information that increase the likelihood of persons inaccurately being identified as convicted felons. Officials should create a transparent process in which the state must demonstrate the dependability of its voter purge list before implementing removals. Considering the high rate of "false positives," the burden should be on the state to establish that its process of identification and removal is precise, and a streamlined appeal process should be implemented to challenge removals that are believed to be incorrect.

**Assess the impact of drug policies on disenfranchisement** – Over the past twenty years, drug policies have been the single most significant factor in contributing to the rise in correctional populations, along with consequent racial disparities. Voter disenfranchisement is one of a host of consequences of a drug conviction, which may also include restrictions on access to welfare benefits, public housing, and student loans. In order to reduce these unnecessary collateral effects, policymakers should consider a

---

[28] Brennan Center for Justice (2000). *Right to Vote Research Toolkit: How to Survey Voting Registration Procedures for People with Felony Convictions.* New York: New York University School of Law.

[29] For another example, see Singleton, D.A. & Walas, B. (2004). *The Disenfranchisement of the Re-Enfranchised: How Confusion Over Felon Voter Eligibility in Ohio Keeps Qualified Ex-Offender Voters from the Polls.* Cincinnati, OH: Prison Reform Advocacy Center.

two-staged approach to drug problems: 1) greater investments in prevention and treatment so as to avoid unnecessary use of the criminal justice system to address drug problems; and, 2) through charging decisions or drug court processes, utilize a greater proportion of misdemeanor convictions in such cases so as to avoid the wide range of additional penalties that accompany a felony conviction.

## Appendix A – Methodology

### *The Use of Zip Codes as a Neighborhood Proxy*

Using zip codes to represent a community or neighborhood is often a concern because a community is an organic creation of the residents in a geographic area, and is often defined by those residents, while a zip code is an administrative tool created for mail delivery efficiency which often does not take neighborhood definitions into consideration. However, the intent of this project is to measure the impact of disenfranchisement at the local level and a zip code is an appropriately sized geographic unit, relatively equal in population, that easily permits the quantification of localized estimates. Moreover, as seen in Table 8, the zip code neighborhoods used in this analysis were relatively homogeneous in race and poverty with a few zip codes of a diverse racial and economic make-up which we believe is reflective of neighborhoods in Atlanta as a whole. For these reasons, although there are potential concerns in using a zip code as a proxy for a neighborhood, we do not believe that any of these biases affect the reliability of our estimates.

### *Data Processing Notes*

The datafile contained a number of missing addresses, which is not uncommon when working with files collected for administrative purposes. Several of the addresses had missing zip codes or improperly identified streets. In order to address this missing data, a two-stage process was undertaken. A significant proportion of the addresses simply had missing zip codes. In order to fill in this information, each address was inputted into the United State Postal Service's Zip Code Locator on its website. This permitted the completion of the majority of missing addresses.

For those persons who did not report an address, or whose address was unable to be matched on the USPS database, a second stage of interpolation was used to fully estimate the number of persons disenfranchised. First, all addresses were collected by zip code. Second, all missing addresses were assigned a zip code proportional to the address distribution of the known addresses. The assumption being made through this method is that the geographic distribution of persons with unknown addresses is identical to the distribution of persons with known addresses. This same assumption was necessary when calculating the racial breakdown of persons with missing data within a zip code. At the conclusion of this two-step process, we were able to create an estimate of the number of persons in Atlanta that were disenfranchised as of September 2003, and the zip code that they reported as their address.

The second component of this study utilized United States Census Bureau data. Zip-code level data was obtained for percent Non-Hispanic black, percent Non-Hispanic white, median household income, and poverty rate. These figures were merged with the correctional data at the zip code level in order to create a working file to produce localized estimates of the impact of felon disenfranchisement.

**Appendix B - Categories of Felons Disenfranchised Under State Law**

| STATE | PRISON | PROBATION | PAROLE | EX-FELONS All* | EX-FELONS Partial |
|---|---|---|---|---|---|
| Alabama | X | X | X | x | |
| Alaska | X | X | X | | |
| Arizona | X | X | X | | X (2nd felony) |
| Arkansas | X | X | X | | |
| California | X | | X | | |
| Colorado | X | | X | | |
| Connecticut | X | | X | | |
| Delaware | X | X | X | | X (5 years) |
| District of Columbia | X | | | | |
| Florida | X | X | X | X | |
| Georgia | X | X | X | | |
| Hawaii | X | | | | |
| Idaho | X | X | X | | |
| Illinois | X | | | | |
| Indiana | X | | | | |
| Iowa | X | X | X | X | |
| Kansas | X | X | X | | |
| Kentucky | X | X | X | X | |
| Louisiana | X | X | X | | |
| Maine | | | | | |
| Maryland | X | X | X | | X (2nd felony, 3 years) |
| Massachusetts | X | | | | |
| Michigan | X | | | | |
| Minnesota | X | X | X | | |
| Mississippi | X | X | X | X | |
| Missouri | X | X | X | | |
| Montana | X | | | | |
| Nebraska | X | X | X | X | |
| Nevada | X | X | X | | X (except first-time nonviolent) |
| New Hampshire | X | | | | |
| New Jersey | X | X | X | | |
| New Mexico | X | X | X | | |
| New York | X | | X | | |
| North Carolina | X | X | X | | |
| North Dakota | X | | | | |
| Ohio | X | | | | |
| Oklahoma | X | X | X | | |
| Oregon | X | | | | |
| Pennsylvania | X | | | | |
| Rhode Island | X | X | X | | |
| South Carolina | X | X | X | | |
| South Dakota | X | | | | |
| Tennessee | X | X | X | | X (post-1981) |
| Texas | X | X | X | | |
| Utah | X | | | | |
| Vermont | | | | | |
| Virginia | X | X | X | X | |
| Washington | X | X | X | | X (pre-1984) |
| West Virginia | X | X | X | | |
| Wisconsin | X | X | X | | |
| Wyoming | X | X | X | | X (5 years) |
| | | | | | |
| U.S. Total | 49 | 31 | 35 | 7 | 7 |

*\* While these states disenfranchise all persons with a felony conviction and provide no automatic process for restoration of rights, several (Alabama, Kentucky, and Virginia) have adopted legislation in recent years that streamlines the restoration process.*

Source: Jamie Fellner and Marc Mauer, *Losing the Vote: The Impact of Felony Disenfranchisement Laws in the United States*, Human Rights Watch and The Sentencing Project, October 1998, and updated by The Sentencing Project.

# ADDENDUM    B

# FELONY DISENFRANCHISEMENT LAWS
## IN THE UNITED STATES

Since the founding of the country, most states in the U.S. have enacted laws disenfranchising people currently or previously having been convicted of a felony. In the last 40 years, due to the dramatic expansion of the criminal justice system, these laws have significantly affected the political voice of many American communities. The momentum toward reform of these policies has been based on a reconsideration of their wisdom in meeting legitimate correctional objectives and the interests of full democratic participation.

## STATE DISENFRANCHISEMENT LAWS



- 48 states and the District of Columbia prohibit voting while incarcerated for a felony offense. Only two states - Maine and Vermont - permit persons in prison to vote.

- 35 states prohibit persons on parole from voting and 31 of these states exclude persons on probation as well.

- Four states deny the right to vote to all persons with felony convictions, even after they have completed their sentences. Eight others disenfranchise certain categories of ex-offenders and/or permit application for restoration of rights for specified offenses after a waiting period (e.g., five years in Wyoming, and two years in Nebraska).

Voting prohibited in prison
Voting allowed in prison

- Each state has developed its own process of restoring voting rights to ex-offenders, but most of these restoration processes are so cumbersome that relatively few persons are able to take advantage of them.

### Disenfranchisement Rate, 2010



Black Voters
1 in **13**



Non-Black Voters
1 in **56**

## RACIALLY DISPARATE IMPACT

- An estimated 5.85 million Americans, or one in forty adults, have currently or permanently lost their voting rights as a result of a felony conviction.

- 2.2 million African Americans, or 7.7% of black adults, are disenfranchised, compared to 1.8% of the non-African American population. In three states – Florida (23%), Kentucky (22%), and Virginia (20%) – more than one in five African Americans is disenfranchised.

- Given current rates of incarceration, three in ten of the next generation of black men can expect to be

**FACT SHEET: FELONY DISENFRANCHISEMENT LAWS**

disenfranchised at some point in their lifetime. In states that disenfranchise ex-offenders, as many as 40% of black men may permanently lose their right to vote.

- 2.6 million disenfranchised persons have completed their sentences, comprising 45% of the total disenfranchised population.



**3** in **10 black men** can expect to be **disenfranchised** at **some point** in their lifetime

# RECENT POLICY CHANGES



### ALABAMA

In 2003, Governor Riley signed into law a bill that permits most felons to apply for a certificate of eligibility to register to vote after completing their sentence.

### CONNECTICUT



In 2001, Governor Rowland signed into law a bill that extends voting rights to felons on probation. The law made 36,000 persons eligible to vote.



### DELAWARE

In 2000, the General Assembly passed a constitutional amendment restoring voting rights to some ex-felons five years after the completion of their sentence. In 2013, the five-year waiting period was eliminated for most offenses.



In 2007, the Office of Executive Clemency voted to amend the state's voting rights restoration procedure to automatically approve the reinstatement of rights for many persons who were convicted of non-violent offenses. This decision was reversed in 2011, and persons seeking rights restoration must now wait at least five years after completion of sentence.

### FLORIDA

### IOWA



Governor Vilsack issued an executive order in 2005 automatically restoring the voting rights of all ex-felons, but this order was rescinded by Governor Branstad in 2011.

### KANSAS

In 2002, the Legislature added probationers to the category of excluded felons.

In 2001, the Legislature passed a bill that requires that the Department of Corrections inform and aid eligible offenders in completing the restoration process to regain their civil rights.

### KENTUCKY

### MARYLAND

In 2007, the Legislature repealed all provisions of the state's lifetime voting ban, including the three-year waiting period after completion of sentence for certain categories of offenses, and instituted an automatic restoration policy for all persons upon completion of sentence.

### MASSACHUSETTS



In 2000, the Massachusetts electorate voted in favor of a constitutional amendment, which strips persons incarcerated for a felony offense of their right to vote.

### NEBRASKA

In 2005, the Legislature repealed the lifetime ban on all felons and replaced it with a two-year post-sentence ban.

# FACT SHEET: FELONY DISENFRANCHISEMENT LAWS



**NEVADA**

In 2003, the state approved a provision to automatically restore voting rights for first-time nonviolent felons immediately after completion of sentence.

**UTAH**



In 1998, Utah voters approved an amendment prohibiting persons incarcerated for a felony conviction from voting.

**NEW MEXICO**

In 2001, the Legislature adopted a bill repealing the state's lifetime ban on ex-felon voting. In 2005, a bill was passed that requires the Department of Corrections to provide notification of completion of sentence to the Secretary of State's office.



**VIRGINIA**

The Virginia legislature passed a law in 2000 enabling certain ex-felons to apply to the circuit court for the restoration of their voting rights five years after the completion of their sentence; those convicted of felony drug offenses must wait seven years after completion. In 2013, Governor McDonnell adopted a policy of rights restoration for non-violent ex-felons without requiring an application.

**RHODE ISLAND**

In 2006, Rhode Island voters approved a referendum to amend the state constitution and restore voting rights to persons currently serving a sentence of probation or parole.



**WASHINGTON**



In 2009, Governor Gregoire signed a bill that eliminated the requirement of paying all fines, fees, and restitution before regaining the right to vote.

**TENNESSEE**



In 2006, the Tennessee legislature amended the country's most complex restoration system by greatly simplifying the procedure. All persons convicted of a felony (except electoral or serious violent offenses) are now eligible to have their right to vote restored upon completion of sentence and may apply for a "certificate of restoration" from the Board of Probation and Parole. All applicants must also satisfy any court-ordered restitution or child support obligations.

**WYOMING**



In 2003, Governor Freudenthal signed a bill to allow people convicted of a non-violent first-time felony to apply for restoration of voting rights five years after completion of sentence.

Sources: Jamie Fellner and Marc Mauer, *Losing the Vote: The Impact of Felony Disenfranchisement Laws in the United States*, Human Rights Watch, The Sentencing Project, October 1998; Nicole D. Porter, *Expanding the Vote: State Felony Disenfranchisement Reform, 1997-2010*, The Sentencing Project, October 2010, updates by The Sentencing Project, and Jeff Manza and Christopher Uggen, <u>Locked Out: Felony Disenfranchisement and American Democracy</u>, 2006

**TEXAS**

In 1997, the Texas Legislature passed a bill, signed by Governor George W. Bush, eliminating the two-year waiting period after completion of sentence before individuals can regain their right to vote.


## Disenfranchisement Categories Under State Law

| State | Prison | Probation | Parole | Post-Sentence | |
|---|---|---|---|---|---|
| | | | | All | Partial |
| Alabama | X | X | X | | X (certain offenses) |
| Alaska | X | X | X | | |
| Arizona | X | X | X | | X (2nd felony) |
| Arkansas* | X | X | X | | |
| California | X | | X | | |
| Colorado | X | | X | | |
| Connecticut | X | | X | | |
| Delaware | X | X | X | | X (certain offenses 5 years) |
| District of Columbia | X | | | | |
| Florida | X | X | X | X | |
| Georgia | X | X | X | | |
| Hawaii | X | | | | |
| Idaho | X | X | X | | |
| Illinois | X | | | | |
| Indiana | X | | | | |
| Iowa | X | X | X | X | |
| Kansas | X | X | X | | |
| Kentucky | X | X | X | X | |
| Louisiana | X | X | X | | |
| Maine | | | | | |
| Maryland | X | X | X | | |
| Massachusetts | X | | | | |
| Michigan | X | | | | |
| Minnesota | X | X | X | | |
| Mississippi | X | X | X | | X (certain offenses) |
| Missouri | X | X | X | | |
| Montana | X | | | | |
| Nebraska | X | X | X | | X (2 years) |
| Nevada | X | X | X | | X (except first-time non-violent) |
| New Hampshire | X | | | | |
| New Jersey | X | X | X | | |
| New Mexico | X | X | X | | |
| New York | X | | X | | |
| North Carolina | X | X | X | | |
| North Dakota | X | | | | |
| Ohio | X | | | | |
| Oklahoma | X | X | X | | |
| Oregon | X | | | | |
| Pennsylvania | X | | | | |
| Rhode Island | X | | | | |
| South Carolina | X | X | X | | |
| South Dakota | X | X | X | | |
| Tennessee | X | X | X | | X (certain offenses) |
| Texas | X | X | X | | |
| Utah | X | | | | |
| Vermont | | | | | |
| Virginia | X | X | X | X | |
| Washington | X | X | X | | |
| West Virginia | X | X | X | | |
| Wisconsin | X | X | X | | |
| Wyoming | X | X | X | | X (certain offenses 5 years) |
| U.S. Total | 49 | 31 | 35 | 4 | 8 |

* Failure to satisfy obligations associated with convictions may result in post-sentence loss of voting rights.

Updated April 2014

ADDENDUM    C

Westlaw.

127 F.3d 1103, 1997 WL 650921 (C.A.6 (Tenn.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 127 F.3d 1103, 1997 WL 650921 (C.A.6 (Tenn.)))**

**H**

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing in
the Federal Reporter. Use FI CTA6 Rule 28 and FI
CTA6 IOP 206 for rules regarding the citation of
unpublished opinions.)

United States Court of Appeals, Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Alex PARRISH, defendnat-Appellant.

No. 96-5756.
Oct. 16, 1997.

On Appeal from the United States District Court for
the Western District of Tennessee, No. 95-20172;
Turner.

Before: NELSON and RYAN, Circuit Judges;
QUIST, District Judge. FN*

> FN* The Honorable Gordon J. Quist, United
> States District Judge for the Western District
> of Michigan, sitting by designation.

RYAN, Circuit Judge.

**\*1** Defendant Alex Parrish appeals from a judg-
ment entered on a jury verdict convicting him of
possessing a firearm after having been previously
convicted of a crime punishable by imprisonment for
a term exceeding one year, in violation of 18 U.S.C.
§ 922(g). Because the district court erred in refusing
the defendant's offer to stipulate to his prior offenses,
and the error likely prejudiced the outcome of the
trial we must reverse the judgment of conviction.

I

Alex Parrish was arrested on February 8, 1995,
by a member of the Memphis Police Department and
a Special Agent from the Federal Bureau of Investi-
gation. Parrish was alone in a gray Dodge automobile
when he was arrested, and the law enforcement offi-
cers recovered a .22 caliber pistol either from the
defendant's person or from the automobile. Both the
Memphis officer and the Special Agent testified at
trial that the gun was removed from the defendant's
waistband. They also testified that the Memphis offi-
cer opened the car door and removed Parrish from
within. Over the defendant's objection and despite his
offer to stipulate that he was a convicted felon, an-
other Memphis officer was allowed to testify that
Parrish had been convicted of two counts of aggra-
vated robbery, and one count each of robbery and
sale of cocaine. Each of these convictions occurred in
1990.

Later, in his case in chief, Parrish took the stand
and admitted to the convictions. He also testified that
the gray Dodge in which he was arrested was his
girlfriend's, and that the driver's door could not be
opened from the outside. More importantly, he stated
that the officers found the gun inside the car, and not
in his waistband. Parrish claimed he had no prior
knowledge of the existence of the gun. Parrish's girl-
friend verified that the car was hers and that the
driver's door could not be opened from the outside.
Ultimately, the jury convicted on the sole count of
the indictment.

II.

It is unlawful for anyone "who has been con-
victed in any court of, a crime punishable by impris-
onment for a term exceeding one year" to "possess in
or affecting commerce, any firearm...." 18 U.S.C. §

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

127 F.3d 1103, 1997 WL 650921 (C.A.6 (Tenn.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 127 F.3d 1103, 1997 WL 650921 (C.A.6 (Tenn.)))**
922(g)(1). Thus, evidence of a **prior** felony conviction is relevant in a section 922(g)(1) prosecution because it is an element of the **offense**. However, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of **unfair prejudice**." Fed.R. Evid. 403.

The Supreme Court has recently held that a district court "abuses its discretion" when it refuses a defendant's offer to stipulate as to a **prior offense** in a felon-in-possession case, if the **prior** conviction raises the risk of improper considerations by the jury, and the only rationale for admitting the **offense** is to prove that the defendant meets the relevant criterion of section 922(g)(1). *Old Chief v. United States,* 117 S.Ct. 644, 647 (1997). In *Old Chief,* the defendant had previously been convicted of assault causing serious bodily injury. He offered to stipulate to that fact, but both the government and the district court refused. Over a renewed objection, the prosecution at trial introduced the order of judgment and commitment for Old Chief's **prior** conviction. Old Chief was ultimately convicted of violating 18 U.S.C. § 922(g)(1). *Id.*

**\*2** In reversing the conviction, the Supreme Court observed that convicting a felon of unlawful possession of a firearm merely because the **prior** conviction established a tendency to disobey the law would be an impermissible basis for the verdict. *Id.* at 650. Next, the Court opined that a court's probative value/ **unfair prejudice** calculation should be informed by the available alternatives. If an equally probative, but less **unfairly prejudicial**, item of evidence is available, then the second should be substituted for the first. *Id.* at 652. The evidence at issue in *Old Chief* had a clear risk of **unfair prejudice**, and the alternative-a stipulation that the defendant had been convicted of a crime punishable by more than one year's imprisonment-would be equally probative in terms of proving the elements of the crime charged. Although the prosecution has a general right

to "tell its story" and, within limits, introduce the type of evidence it sees fit, that right has "virtually no application when the point at issue is a defendant's legal status, dependent on some judgment rendered wholly independently of the concrete events of later criminal behavior charged against him." *Id.* at 654-55. Further, such a stipulation would mitigate the danger of unfair prejudice. *Id.* at 653. Therefore, as a matter of law, the Court said, it is an "abuse of discretion" for a district court to refuse a defendant's offer to stipulate to the fact of a felony conviction in a section 922(g)(1) prosecution.

Given these peculiarities of the element of felony-convict status and of admissions and the like when used to prove it, there is no cognizable difference between the evidentiary significance of an admission and of the legitimately probative component of the official **record** the prosecution would prefer to place in evidence. For purposes of the Rule 403 weighing of the probative against the **prejudicial**, the functions of the competing evidence are distinguishable only by the risk inherent in the one and wholly absent from the other. In this case, *as in any other in which the **prior** conviction is for an **offense** likely to support conviction on some improper ground, the only reasonable conclusion* was that the risk of **unfair prejudice** did substantially outweigh the discounted probative value of the **record** of conviction, and it was an *abuse of discretion* to admit the **record** when an admission was available.

*Id.* at 655 (emphasis added).

The Supreme Court did not explain how refusing to receive the stipulation, as opposed to receiving other evidence of the **prior** conviction, could be an "abuse of discretion," if the district court had no discretion to exercise. That is, since a stipulation that a defendant charged with being a felon in possession of a firearm is a convicted felon will *always* be "equally

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

127 F.3d 1103, 1997 WL 650921 (C.A.6 (Tenn.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 127 F.3d 1103, 1997 WL 650921 (C.A.6 (Tenn.)))**

probative, but less unfairly prejudicial" of the fact than a certificate of conviction describing the prior felony, there can be no judicial discretion to reject the stipulation, but only error in doing so. If there was no discretion, it is difficult to conceive how it could have been "abuse[d]." We are aware that some courts, including this one, have declared that committing an error of law is an abuse of discretion. *See United States v. Taplin,* 954 F.2d 1256, 1258 (6th Cir.1992). How that can be so is a puzzlement. On the other hand, this court has recently recognized the incongruity in equating an abuse of discretion with an error of law.

   **\*3** This interpretation of abuse of discretion review is confusing because it essentially equates abuse of discretion review with de novo review. The more sensible approach is to differentiate between evidentiary rulings so inextricably tied into the facts of a case that a deferential abuse of discretion standard of review is appropriate and those evidentiary rulings presenting pure questions of law construing the Federal Rules of Evidence, where this court will show a district court no deference.

   *EEOC v. Ford Motor Co.,* No. 95-3019, 1996 WL 557800, at \*5 (6th Cir. Sept. 30, 1996), (unpublished disposition).

   In any event, there can be no question that the trial court, ruling upon essentially identical facts as were involved in *Old Chief,* erred. Indeed, all *four* of Parrish's convictions were allowed into evidence, instead of a single conviction as in *Old Chief.*

                      ILL.
   The government also argues that the defendant's prior criminal record was properly admitted on the alternative theory of impeachment under Fed.R.Evid. 609(a).

   In support of the argument that Parrish's four

prior convictions were admissible for impeachment, the government relies heavily upon the fact that Parrish took the stand and acknowledged his prior record. The government states:

   Thus, even if the government had not introduced Appellant's prior offenses during its case in chief, Appellant provided the government that opportunity during cross-examination. Further, Appellant should not now complain that he was unduly prejudiced because the district court admitted his prior offenses when he offered such evidence during his direct testimony.

   In the first place, Parrish cannot be faulted for attempting to mitigate the effect of these convictions when he acknowledged them on the stand *after* they already had been admitted into evidence. His acknowledgment cannot subsequently deprive him of the opportunity to challenge on appeal the district court's error. In fact, Parrish has signed an affidavit averring that he would not have testified if the court had rejected the admission of his prior record, as in the hindsight of *Old Chief,* it should have done. The government has not contested this statement.

   More importantly, even if we ignore the defendant's affidavit and disregard the fact that his prior convictions *were neither offered nor admitted as impeachment,* his criminal record nevertheless was probably inadmissible under this alternate theory advanced by the government. Fed.R.Evid. 609(a) states:

   For the purpose of attacking the credibility of a witness,

   (1) evidence that a witness *other than an accused* has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

127 F.3d 1103, 1997 WL 650921 (C.A.6 (Tenn.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 127 F.3d 1103, 1997 WL 650921 (C.A.6 (Tenn.)))**

and evidence that an *accused* has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused; and

**\*4** (2) evidence that *any* witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment.

Fed.R.Evid. 609(a) (emphasis added). Because aggravated robbery, robbery, and sale of cocaine are not crimes of dishonesty or false statement, *see, e.g., United States v. Scisney,* 885 F.2d 325, 326 (6th Cir.1989), Parrish's **record** could only be introduced under Rule 609 if the court determined that the probative value of the evidence outweighed its **prejudical** effect. Unlike Federal Rule of Evidence 403, in which probative evidence is excluded only if its **prejudicial** value is *substantiall* y outweighed by the danger of **unfair prejudice,** Rule 609(a)(1) creates in essence a presumption of **unfair prejudice** which has not been overcome in this case.

Finally, although the issue is closer, the court's error was not harmless. The defendant's offer to stipulate and his objection at trial demonstrate the importance of the conviction evidence. Even if Parrish had not taken the stand, his girlfriend's testimony raised some question as to the veracity of the officers' account of the arrest regarding the allegedly nonoperational door. If the officers were not believed on this point, a jury could reasonably question the offered testimony regarding the location of the gun. The apparent absence of the defendant's fingerprints on the weapon could also have raised a question whether he knowingly possessed the gun. The fact that the defendant's four prior convictions involved types of crimes often associated with handgun use not only would have facilitated impermissible bad-character reasoning, but also could have made it easier for the jury to believe the officers' version of the arrest. In other words, the evidence against Parrish was less than overwhelming, and we cannot say with confidence that the unfair prejudice caused by the inadmissible evidence did not make the difference between acquittal and conviction.

IV.

Therefore, the judgment of conviction must be REVERSED.

QUIST, District Judge, concurring.

I agree with everything that Judge Ryan has stated except the paragraph in Part III containing the statement that defendant's criminal **record** "was probably inadmissible" under Fed.R.Evid. 609(a). It is not necessary to reach this speculative point because, as Judge Ryan notes, the evidence of the **prior** convictions was never offered under Fed.R.Evid. 609(a)(1), and, if you accept defendant's affidavit, never will be because the defendant will never testify. Even if defendant does testify, the district judge may not permit evidence of the **prior** convictions because the district judge might find that the probative value does not substantially outweigh **unfair prejudice.**

I respectfully submit that any statement regarding admissibility of **prior** convictions under Fed.R.Evid. 609(a) should await a case wherein the issue arises in the district court and is then properly presented to this Court. However, as stated, I concur with the rest of the Opinion.

C.A.6 (Tenn.),1997.
U.S. v. Parrish
127 F.3d 1103, 1997 WL 650921 (C.A.6 (Tenn.))

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ADDENDUM     D



Not Reported in F.Supp.2d, 2009 WL 595980 (E.D.Tenn.)
**(Cite as: 2009 WL 595980 (E.D.Tenn.))**

H

Only the Westlaw citation is currently available.

United States District Court, E.D. Tennessee.
UNITED STATES of America, Plaintiff,
v.
Robert D. CAMPBELL, Defendant.

No. 3:05–CR–23.
March 6, 2009.

West KeySummary**Criminal Law 110**
🔑**374.18(1)**

110 Criminal Law
   110XVII Evidence
     110XVII(F) Other Misconduct by Accused
      110XVII(F)13 Proof and Effect
       110k374.15 Preliminary Evidence
        110k374.18 Offer of Proof
         110k374.18(1) k. In general.
Most Cited Cases
  (Formerly 110k369.1)

**Criminal Law 110** 🔑**374.18(2)**

110 Criminal Law
   110XVII Evidence
     110XVII(F) Other Misconduct by Accused
      110XVII(F)13 Proof and Effect
       110k374.15 Preliminary Evidence
        110k374.18 Offer of Proof
         110k374.18(2) k. Identifying
purpose for which evidence is offered. Most Cited
Cases
  (Formerly 110k369.1)

  Evidence of defendant's prior criminal convic-
tions and prior criminal activity, including possession
of firearms and gang membership, was not admissi-
ble. Government did not identify the specific purpose
for which it offered the other act evidence, nor did it
provide information for the court to determine if that
identified purpose was material to the issue in defen-
dant's case. Fed.Rules Evid.Rule 404(b), 28 U.S.C.A.

***MEMORANDUM AND ORDER***

C. CLIFFORD SHIRLEY, JR., United States Magis-
trate Judge.

  **\*1** All pretrial motions in this case have been re-
ferred to the undersigned pursuant to 28 U.S.C. §
636(b) for disposition or report and recommendation
regarding disposition by the District Court as may be
appropriate. This matter is before the Court on de-
fendant's Motion *In Limine* To Bar The Introduction
Of, Or Reference To, Mr. Campbell's Prior Convic-
tions Either As Proof That He Violated 18 U.S.C. §
922(g) or as Propensity Evidence, And To Redact
The Nature Of Any Prior Convictions From All
Documents And Any Testimentary Evidence [Doc.
123]. The government filed a Response [Doc. 129]
and the defendant filed a Reply [Doc. 133].

  Defendant seeks a bar on the introduction or ref-
erence to any of defendants prior convictions: (1)
either as proof he violated 18 U.S .C. § 922(g); (2) or
as propensity evidence; and (3) that all references to
such prior convictions be redacted.

  Defendants motion, to the extent it is limited as
titled, seeks to bar the introduction or reference to
defendant's prior convictions as 1) proof he violated
18 U.S.C. 922(g) and 2) as propensity evidence, is
well taken and it does not appear to be contested by
the government. Simply put, the first part of defen-
dant's motion appears to be an invocation of *Old
Chief v. United States,* 519 U.S. 172, 117 S.Ct. 644,
136 L.Ed.2d 574 (1997), which provides that the
government is required to accept defendant's stipula-
tion to previous qualifying felony convictions that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 595980 (E.D.Tenn.)
**(Cite as: 2009 WL 595980 (E.D.Tenn.))**

satisfies the governments burden of proof as to that element of 18 U.S.C. § 922(g)(1), and that neither the name nor nature of the prior offense is to be disclosed to the jury. Defendant states in his brief that such a stipulation will be entered into. As such, defendant is correct that the number, nature and substance of defendant's prior convictions are inadmissible as proof of that element, in that charge (i.e. count 3 of the Second Superseding Indictment). The government's response does not address this issue.

Likewise the title of the defendant's motion seeks to bar such prior convictions from admission as propensity evidence. This appears to be a 404(b) argument, which specifically deems that evidence of other crimes or wrongs are not admissible for the purpose of showing or proving "action in conformity therewith". That rule however contains exceptions to the admission of evidence for other purposes, but still bars the admission for the purpose of use as propensity evidence. On this issue the government appears to agree. Thus, to the extent defendant seeks to simply exclude evidence of his prior convictions as "propensity evidence" only, his motion again appears to be well taken.

Finally, the title of defendant's motion also seeks to "redact the nature of any prior convictions from all documents and any testimony evidence." Again to the extent, and in the context that this relates to Count 3 (felon in possession of a firearm) and to the *Old Chief* stipulation, this part of the motion appears to be well taken. In that limited context and to that limited extent, it seeks to prevent the government from doing through the back door (i.e. admitting the number, nature, name and substance of defendant's prior criminal convictions) that which it could not do through the front door (as barred by *Old Chief* ). Again the government does not address the redaction issue at all in its response.

**\*2** Thus, based on the title of defendant's motion and those portions of defendant's brief addressing

these issues as limited above, the motion appears to be well taken.

However, a careful reading of the defendant's motion and brief indicates that defendant is also seeking relief far beyond that stated in the title of the motion. It is with regard to this relief that the government's response is directed. While it could be argued that such matters are beyond the actual motion made by defendant, the Court will nonetheless address them as they are likely to impact the trial of this matter and are clearly in dispute between the parties.

The extraneous relief sought by defendant appears to be a request for a blanket bar to the introduction of defendant's prior convictions for virtually any purpose. The Court arrives at this conclusion because of the defendant's motion and brief which argues that such prior felony convictions are inadmissible under Rules 404(b), 608, 609(a) and (b). This Court has previously ruled in *United States of America v. Jarnigan,* (Case No. 3:08–CR–07, Doc. 33) that with regard to a indictment that *only* charges 922(g) (1) offenses (in that case Count 1 being a felon in possession of a firearm and Count 2 being a felon in possession of ammunition), the government may not circumvent the rule in *Old Chief* and the defendant's stipulation, (either in its case in chief or in cross examination of the defendant or witnesses), under the guise of Federal Rules of Evidence 609(a)(1) or Federal Rules of Evidence 403. The Court still holds that in such cases, where the *only* charges against a defendant are 922(g)(1) charges, and where defendant has offered to stipulate to a qualifying felony, that the government is precluded from attempting to introduce the number, nature, name or substance of defendant's prior felony convictions under the aforementioned rules of evidence.[FN1]

FN1. Although the Court in *Jarnigan* was not called upon to rule and did not rule whether a similar bar would apply with regard to a Federal Rules of Evidence 404(b)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 595980 (E.D.Tenn.)
**(Cite as: 2009 WL 595980 (E.D.Tenn.))**

or Federal Rules of Evidence 609(b) argument, (See footnotes 2 & 3 of Doc. 33), it should appear obvious from the Courts ruling and reasoning that in a case involving only 922(g)(1) charges, a similar ruling might be likely regardless of the Federal Rules of Evidence involved.

However, this case involves other counts including other firearm charges, drug charges, and involves additional elements for the government to prove.

The Court notes, for guidance and clarification, that the mere fact that the defendant has one count (Count 3) that is subject to *Old Chief* (and the bar to introducing the name or nature of the prior convictions) does not operate as a bar to the potential for admitting the prior convictions with regard to the other charges. *See United States v. Kemp,* 546 F.3d 759 (6th Cir.2008), *United States v. Marshall,* 226 Fed. Appx. 551, 554 (6th Cir.2007), *United States v. Beamsus,* 110 Fed. Appx. 513 (6th Cir.2004), *United States v. Oguogu,* 234 F.3d 1270 (6th Cir.2002).

### *MENTAL CONDITION / INSANITY DEFENSE*

In addition, the defendant has given notice of his intent to present expert evidence of a mental condition bearing on the issue of guilt and/or to assert a defense of insanity.

The prior convictions in issue, per the governments response, appear to be:

1) Facilitation of second degree murder 1998

**\*3** 2) Aggravated assault 1997

3) Aggravated robbery 1997

4) Aggravated robbery 1997

With regard to defendant's insanity defense, the government notes that defendant acknowledges "virtually all of the information he seeks to exclude from the jury was included in his confession to the police, in his medical and psychiatric records" and that "most if not all of the information at issue was presented to and considered by the various examiners." The government relied upon *United States v. Bradshaw,* 935 F.2d 295, 302 (D.C.Cir.1991) and *United States v. Diekoff,* 535 F.3d 611, 618 (9th Cir.2008) in support of its argument that the defendant's raising of an insanity defense puts his "state of mind in issue." With this argument the court generally agrees, and finds both cases cited support such a broad proposition. However, *Bradshaw* goes on, in the same sentence to state "and a criminal record for *similar acts* is highly relevant to the basis for and reliability of the witnesses' testimony about the defendant's appreciation for the unacceptability of his conduct" *Bradshaw,* at 302 (emphasis added). In *Bradshaw,* the defendant was charged with bank robbery and attempted bank robbery. The prior convictions were for bank robbery and attempted bank robbery, forgery and fraud. In *Diekoff,* the defendant was charged with kidnapping, using a firearm during a crime of violence, and being a felon in possession of a firearm. The prior conviction in issue was for kidnapping. The Court in *Diekoff* noted "the fact that *Diekoff* had committed a *similar* kidnapping offense in the past made it more likely that he understood that the activity underlying the charged offense was wrong as well" citing *Bradshaw.* The Court also noted that his prior kidnapping offense showed "he was mentally capable of planning a complicated criminal act." The Court later quoted the relevance of "similar acts" from *Bradshaw* as set forth above.

The Court also notes the case of *United States v. Ruster,* 712 F.2d 409 (9th Cir.1993), in which a defendant was charged with making false claims. There the defendant also alleged insanity. The government sought to introduce "references to several previous false claims and break ins in which he was in-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 595980 (E.D.Tenn.)
**(Cite as: 2009 WL 595980 (E.D.Tenn.))**

volved." *Id.* at 411. The Court noted that the issue for the jury was whether the defendant was sane when he made the false claims and stated "as the trial judge recognized, the *previous similar criminal acts* were relevant to the jury's evaluation of Ruster's expert's testimony as to his mental state during the later offenses," and later referenced the *"numerous similar incidents." Id.* at 412 (emphasis added).

From all of this, the Court concludes that the admission of prior convictions which are "similar" in nature to the current charges against a defendant are relevant as to defendant's mental state or state of mind and can be inquired into. However, in this case, the defendant argues that the prior convictions for facilitation of murder, assault and robbery are not "similar" to the current charges against the defendant for drug trafficking crimes, carrying a weapon while committing drug trafficking crimes and being a felon in possession of a firearm. Based on the limited evidence before it, the Court agrees with the defendant and finds that the government can not introduce evidence of "unsimilar" prior convictions with regard to the insanity defense on the basis of relevance.

**\*4** However, that does not end the inquiry. The government has indicated "information at issue," presumably the prior convictions, was presented to and considered by the various examiners" and included in defendant's "medical and psychiatric records." Accordingly, this Court believes that if the experts actually considered and relied upon these prior convictions in reaching their opinions, then they may be inquired into during examination of such experts. More specifically, if the experts merely reviewed these prior convictions, but did not rely upon them in reaching their opinions on sanity, the prior convictions may not be inquired into.

As this issue has not been sufficiently developed for the court to rule on, the parties will need to address this issue with Judge Phillips prior to any inquiry into such prior criminal convictions, and outside the hearing of the jury.

*Federal Rule of Evidence 404(b)*

With regard to the admissibility of defendant's prior criminal convictions and "prior criminal activity (including his possession of firearms [FN2] and gang membership)" (Government's Response Doc. 129, page 7) under 404(b) the defendant argues that his prior crimes, wrongs, and acts are not admissible as they are merely attempts to prove his character to show conformity. The Court has already addressed that argument. The government argues that 404(b) is an inclusive rule because of the numerous non-exclusive exceptions which allow the use of such prior crimes, wrongs, and acts (i.e. such evidence is admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident). The government also points to the Sixth Circuit's four step test for admissibility, and the Court's discretion. The government then notes cases in the Sixth Circuit allowing evidence of drug dealing to establish knowledge, motive or intent to posses firearms. The Court does not quarrel with the Government's recitation of the law and 404(b) analysis. However, the government does not point to a single one of the exceptions in 404(b) as a basis for admission in this case. Nor do any of the prior convictions appear to be based on drug dealing.[FN3] Accordingly, the government has not sought to establish the first two steps of the four step analysis it sets out. That is, it has not identified "the specific purpose for which it offers the 'other acts' evidence," nor has it provided information for the Court to determine if that identified purpose is material or in issue in the case." Accordingly, based on the information before this Court, there is simply no basis offered by the government, and accordingly none found, for the admission of the referenced prior criminal convictions or prior wrongs under 404(b).

FN2. The Court has not been fully advised as to what this related to.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 595980 (E.D.Tenn.)
**(Cite as: 2009 WL 595980 (E.D.Tenn.))**

FN3. The Court can not determine if the prior convictions involve firearms or if so, whether they would come within one of the 404(b) exceptions.

However, the government does state that such information could become admissible under 404(b) depending on the defense presented at trial. The Court agrees and to the extent the government deems some defense may render evidence of these prior crimes, wrongs, or acts admissible under 404(b), it will need to address that with Judge Phillips at that time, and outside the hearing of the jury.FN4

FN4. The Court notes the defendant argues none of these exceptions apply because defendant has not asserted a defense such as would put his *credibility* in issue. Without going into the difference in these two arguments, the Courts ruling is simply that it can not make that determination before any proof has been admitted.

### *Federal Rule of Evidence 609*

**\*5** The defendant also argues that his prior convictions are not admissible under Federal Rule of Evidence 609(a) as they don't involve dishonesty or false statements under 609(a)(2), and the stricter balancing test for an accused, under 609(a)(1) argues for exclusion under that rule.

The prior convictions for facilitation to commit second degree murder and assault do not involve dishonesty or false statements, and the absence of any argument by the government on this issue is taken as its concession on that point. Robbery is not a crime involving dishonesty or false statement and the government agrees on this. As such, none of the prior convictions appear admissible under 609(a)(2).

The government argues however, that they may be admissible to impeach the defendant's credibility

under 609(a)(1) depending on whether he testifies (thereby putting his credibility in issue) or he places in evidence, directly or through cross examination, hearsay statements of the defendant—by virtue of Federal Rule of Evidence 806. The Court agrees that such potential exists, and while defendant argues the balancing test under *United States v. Meyers,* 953 F.2d 914 (6th Cir.1992) is capable of pre-trial determination, the Court disagrees. It is unknown whether defendant will testify, or place into evidence statements that come within the ambit of Federal Rule of Evidence 806, and even if such occurs, argument will have to be heard as to *Meyers* factors:

1. The impeachment value of the prior crime;

2. The point in time of the prior conviction and the defendant's subsequent history;

3. The similarity between the prior crime and the charged crime;

4. The importance of the defendant's testimony; and

5. The centrality of the credibility issue.

All of this to be based on the time offered at trial, the nature and extent of the proof, and the overarching 609(a)(1) balancing test requiring that the probative value, outweigh its prejudicial effect to the defendant.

Thus, any ruling on the admissibility of such evidence, most necessarily await its attempted admission, if any, at trial and arguments at that time, and any determination will necessarily have to be made by Judge Phillips and outside the hearing of the jury.

Defendant suggests that 609(b) may bar the admission of such convictions because they are over 10

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 595980 (E.D.Tenn.)
**(Cite as: 2009 WL 595980 (E.D.Tenn.))**

years old. However, as the government points out in its response, and as defendant concedes, 609(b) provides that it is not the date of conviction but the latter of the date of conviction or the "date of release from of the confinement imposed for that conviction" that applies. The government argues this latter date is July, 2004. As such, 609(b) would not be a bar to the admission of such evidence.

Finally, defendant argues that 609(d) bars the admission of any juvenile adjudication. However, that rule only applies to "witnesses other than the accused." As the government has not addressed this issue, nor listed such juvenile adjudication in its list of the defendant's prior convictions, the Court presumes the government does not intend to offer any such evidence as precluded by this rule.

### *Federal Rule of Evidence 608*

**\*6** Defendant also argues defendant's prior convictions are not admissible under Federal Rule of Evidence 608. The government neither disputes nor addresses this contention. The Court thus presumes that the government neither intends to offer any "evidence of character or conduct" of the defendant under Federal Rule of Evidence 608. However, even if it did, the determination of the admissibility would depend upon the nature of the evidence offered and whether defendant's credibility or character for truthfulness were in issue. Furthermore, 608(b) relates to conduct *other than* "conviction of crime as provided in Rule 609."

### *REDACTION*

Finally, with regard to the redaction of the prior conviction information from any documents that might be admitted, the Court finds that at this juncture the government has not established a basis for the introduction of such convictions, but only the potential for such use, and even then, only if the defendant testifies or admits evidence within Federal Rule of Evidence 806.

On the other hand, defendant has established and the Court has ruled herein, at least with regard to Count 3, the felon in possession charge, that the admission of such evidence through documentary evidence would not be proper in light of *Old Chief* and the requisite stipulation. As such, the Court feels that initially the introduction of any documents or evidence regarding defendant's prior convictions should be redacted. However, should defendant testify or introduce or place into evidence statements subject to Rule 806, and should the government be successful in arguing to Judge Phillips for the admission of such prior convictions under the FRE, then the documents may be unredacted (but only as to those prior convictions deemed admissible and only to the extent permitted by Judge Phillips) and such unredacted copies may be admitted as and when permitted by Judge Phillips. The defendant has submitted proposed redactions, but the government has not addressed these. The Court orders the parties to meet and confer regarding such initial redactions. If the parties are unable to reach full agreement, the Court is to be immediately notified and the Court will resolve any remaining disputes.

Wherefore defendant's Motion *In Limine* To Bar The Introduction Of, Or Reference To, Mr. Campbell's Prior Convictions Either As Proof That He Violated 18 U.S.C. § 922(g) or as Propensity Evidence, And To Redact The Nature Of Any Prior Convictions From All Documents And Any Testimentary Evidence **[Doc. 123]** is **GRANTED IN PART AND DENIED IN PART** as set forth herein.

**IT IS SO ORDERED.**

E.D.Tenn.,2009.
U.S. v. Campbell
Not Reported in F.Supp.2d, 2009 WL 595980 (E.D.Tenn.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 595980 (E.D.Tenn.)
**(Cite as: 2009 WL 595980 (E.D.Tenn.))**

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.